## GEORGE H. BRAY AND ANOTHER v. CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY. LYNN J. CITURS AND ANOTHER v. SAME.

232 N. W. 2d 97.

July 25, 1975—Nos. 44945, 44946, 44995, 44996.

*Stringer, Donnelly, Courtney, Cowie & Rohleder,* and *Charles A. Flinn, Jr.,* for appellant.

*Hoversten, Strom, Ryan & Johnson* and *Donald E. Rysavy,* for respondents Bray.

*Leighton, Meany, Cotter & Enger,* and *Terence L. Meany,* for respondents Citurs.

Heard before Kelly, MacLaughlin, and Scott, JJ., and considered and decided by the court en banc.

SCOTT, JUSTICE.

Appeals by defendant railroad from judgments in favor of plaintiffs and from the order of the district court denying defendant's alternative motions for judgments notwithstanding the verdict or for a new trial. We affirm.

These actions arose out of a collision on February 15, 1968, between a truck operated by plaintiff George H. Bray in which plaintiff Lynn J. Citurs was a passenger and a train owned and operated by defendant, Chicago Rock Island and Pacific Railroad Company. Plaintiffs brought their actions for recovery of personal injuries and their wives made claims for loss of consortium and services. The actions were consolidated for trial and remain consolidated upon appeal. The jury returned a special verdict finding defendant negligent in its maintenance of the railroad crossing and plaintiffs negligent—Bray in his operation of the truck and Citurs in his lookout at the crossing. The negligence of each of these parties was found to be a direct cause of the accident and was apportioned as follows: Defendant—70 percent; Bray—20 percent; and Citurs—10 percent. Judgments were entered accordingly.

Plaintiffs moved the district court for an additur or in the alternative a new trial on the issue of damages only. This is not in issue on appeal. Defendant moved the court to set aside the verdict, to enter judgments in accordance with defendant's motion for a directed verdict, or in the alternative for a new trial on the issue of negligence. All motions were denied.

Two issues are presented:

(1) Is there sufficient evidence to sustain the jury verdict that defendant was negligent in its maintenance of the railroad

crossing and that such negligence was the direct cause of the accident and greater than that of either of the plaintiffs?

(2) Were plaintiffs engaged in a joint venture or enterprise at the time of the accident to allow an imputation of the negligence of each plaintiff to the other?

On February 15, 1968, Bray was assisting Citurs in the latter's custom corn shelling operation. The evidence indicated that Bray was employed regularly at Montgomery Ward in Albert Lea, Minnesota, and that his assistance was purely voluntary and gratuitous and that as friends they would often aid each other. Upon completion of the shelling operation, plaintiffs loaded approximately 270 to 280 bushels of the shelled corn for delivery to Glenville. The approximate weight of this corn, which was placed in the box of Citurs' pickup truck, was 15,000 pounds. Plaintiff Bray operated the truck while its owner, Citurs, was a passenger.

The accident occurred in Glenville, Minnesota, at the intersection of County Road No. 5 and the railroad tracks owned and maintained by defendant. A 39-degree angle is formed by this intersection of the two-lane blacktop road and the tracks. Plaintiffs were traveling north upon the north-south road and defendant's train proceeding northwest on one of two possible track settings.

There was evidence of a possible view obstruction by several farm buildings located east of County Road No. 5. However, the more substantial evidence indicates that a signal house maintained and used by defendant was a direct interference with the lookout required for a safe crossing of the tracks. The dimensions of the house are 6 feet by 8 1/2 feet by 9 feet; it is located a mere 10 1/2 feet south of the tracks. Further, the house is located 620 feet east of the intersection, or directly in the line of vision between the stopped truck and the oncoming train.

The crossing was in a state of disrepair, with holes between the rails from 6 to 8 inches deep and loose planks causing protrusions. Defendant's track supervisor testified that the crossing

was in need of repair and required new ties and planks. Further, although he stated that he received no complaints about this condition, he was obviously aware of the problem as shown by his statement that the railroad did not have sufficient material to make the repairs or enough men to maintain the area.

Upon loading the truck, plaintiffs proceeded to the crossing, approximately 1 1/2 miles from the loading point. Both testified as to their familiarity with the crossing. Upon reaching the crossing, Bray stopped the truck (he stated it was approximately 10 to 12 feet from the tracks, while Citurs estimated that it was about 15 to 20 feet from the crossing), but when he was unable to see beyond the signal house, Bray requested Citurs to look further. Upon Citurs' assurance, Bray drove the truck at the speed of 1 mile per hour over the crossing in an attempt to prevent damage to the truck. Neither made further efforts to recheck for approaching trains. Bray allegedly drove slowly across the tracks to allow the front wheels to drop into a hole; he then drove forward to a point where the rear wheels were almost clear. Plaintiffs heard the train whistle, and the crash occurred. The train was not seen by either plaintiff before impact.

The fireman and engineer aboard the train testified that the engineer had blown the whistle from the whistle post to the time of the accident and that they had seen the truck. The fireman testified that the engineer had immediately applied emergency brakes at a point approximately 600 feet from the crossing. The fireman testified that the train was traveling at approximately 65 miles per hour and that its fastest speed over those particular tracks was 70 miles per hour while the engineer estimated the speed prior to the accident at 63 to 64 miles per hour and 45 to 50 miles per hour at impact time.

Three independent witnesses testified as to what they observed before and during the collision. One who was near the collision point stated that he heard the train whistle for approximately 10 to 15 seconds. However, two residents of a nearby home stated

that although they heard the sound of the collision, they did not recall any train whistle.

Another witness who had been driving on Highway No. 65 in a parallel route to that taken by the train stated that he was driving at 65 miles per hour but that the train had been behind him and then passed him at a speed he estimated to be 85 miles per hour. He also stated that he had heard no whistle.

The jury, after hearing and viewing the evidence, returned a special verdict finding defendant negligent in its maintenance of the crossing and that such negligence was a direct cause of the accident. The jury further found that defendant was not negligent in failing to mark the particular crossing as being extra hazardous, in fulfilling its requirement to sound the whistle, or in the operation of the train. Damages assessed by the jury to Bray of $9,000, to Bray's wife of $1,000, to Citurs of $50,000, and to Citurs' wife of $15,000 were reduced by the court in accordance with the percentages of comparative negligence as found by the jury.

I

Defendant contends that even if the crossing was not maintained as required by statute, there is no evidence for holding that such condition was the direct cause of the accident. Thus, it asserts that the jury could not find that its negligence was the direct cause of the accident. The only conclusion possible, in the opinion of defendant, is that the negligence of plaintiffs was greater than that of defendant.

It is well established that this court has given great deference to jury verdicts. In the recent case of Carpenter v. Mattison, 300 Minn. 273, 276, 219 N. W. 2d 625, 628 (1974), we concluded:

"* * * The law is well settled in this jurisdiction that in examining a verdict on appeal the evidence must be considered in the light most favorable to the prevailing party and the verdict must be sustained if it is possible to do so on any reasonable theory of evidence. The verdict should not be disturbed unless it is manifestly and palpably contrary to the evidence."

See, also, Ambroz v. Paukert, 301 Minn. 497, 221 N. W. 2d 701 (1974).

The conclusion necessitated here is that there is sufficient evidence to sustain the jury verdict. As exemplified in the briefs, the parties extensively utilized mathematical calculations which tend to show relative positions of the subject vehicles and various times necessary to stop or to avoid the collision. Defendant states that in comparing the length of time necessary for each vehicle to reach the point of impact, plaintiffs were undoubtedly most able to control the circumstances. They, defendant asserts, were traveling at a minimal rate of speed which would allow them, upon seeing the oncoming train, either to accelerate or to reverse, thereby avoiding the collision. The engineer of the train, on the other hand, applied emergency braking power at the instant he observed the truck and thus had no further control over the collision. The conclusion defendant seeks is therefore that the negligence in failing to see the train was greater than defendant's negligence in causing the accident.

Plaintiffs' calculations lead them to an opposite conclusion. Plaintiffs assert that upon making the required observation, the train was not visible to them due to the obstruction caused by the signal building. Going further, had plaintiffs then viewed the oncoming train when the obstruction was no longer within the path, they might have been able to avoid the accident if the crossing had been in the condition required by statute. The crossing's condition was therefore a direct cause of the accident.

The standard set by Minn. St. 219.08 is that the crossing be maintained in a "safe and passable condition" and be well planked. Further, this court has held that failure to maintain a railroad crossing may be a direct cause of an accident. See, Gowan v. McAdoo, 143 Minn. 227, 173 N. W. 440 (1919), in which the court concluded that had the sleigh been able to pass over the tracks quickly without retardation caused by the condition of the crossing, it would have been safe and the accident would not have occurred. Plaintiffs in the instant case point out

that the question of causation is for the jury's determination which should not be disturbed. Belshan v. Illinois Cent. R. Co. 117 Minn. 110, 134 N. W. 507 (1912); Ambroz v. Paukert, *supra*.

With regard to the duty of plaintiffs to maintain a lookout, this court has imposed upon drivers passing over railroad crossings a burden when the oncoming train "must have been visible from the point where the traveler should have looked and listened." Anderson v. G. N. Ry. Co. 147 Minn. 118, 120, 179 N. W. 687, 688 (1920). In such cases, a presumption arises that the driver was negligent either in his observation or in encountering the known danger.

However, in applying this standard to this case, conflicting evidence is prevalent. Nowhere is there conclusive evidence that the oncoming train "must have been visible" at the necessary time. There is substantial evidence that the proper view was obstructed by defendant's signal building and that plaintiffs stopped to observe when the truck was within 12 to 20 feet of the crossing—a perhaps reasonable observation or lookout.

It therefore appears proper that this issue was submitted to the jury, and that although the jury might have found that plaintiffs were more negligent than defendant, there is, at a minimum, sufficient evidence to support its determination that defendant's negligence was greater.

From the record before us, it is clear that the jury was apprised of each fact which would have any bearing upon the negligence question. It was adequately instructed by the learned trial court with regard to the theories of maintaining a proper lookout and violation of a statutory duty. Applying these instructions to the evidence, the jury could have found that defendant was negligent in failing to maintain the crossing in good repair and that such negligence was a direct cause of the accident.

To add credence to the jury verdict, it is equally clear that it further found that the conduct of each plaintiff in operating the truck and maintaining a lookout, respectively, fell short of rea-

sonable standards. Such a determination was effectuated by a comparison of the causal negligence of each party.

The judgments are therefore affirmed on the basis that the negligence of plaintiffs was not, as a matter of law, equal to or greater than that of defendant, and that there is sufficient evidence to support the jury verdict.

## II

The lower court initially ruled as a matter of law that plaintiffs Bray and Citurs were engaged in a joint venture at the time of the accident, but held that the imputed negligence theory was not applicable. However, upon reconsideration after trial, the court concluded that his ruling on the existence of a joint venture was erroneous under the doctrine set forth in Krengel v. Midwest Automatic Photo, Inc. 295 Minn. 200, 203 N. W. 2d 841 (1973).

The most comprehensive analysis of the theory of joint ventures is set forth in Rehnberg v. Minnesota Homes, Inc. 236 Minn. 230, 235, 52 N. W. 2d 454, 457 (1952). Mr. Justice Matson, author of the opinion, stated that an enterprise does not constitute a joint venture unless each of the following four elements is present:

"(a) *Contribution*—the parties must combine their money, property, time, or skill in some common undertaking, but the contribution of each need not be equal or of the same nature.

"(b) *Joint proprietorship and control*—there must be a proprietary interest and right of mutual control over the subject matter of the property engaged therein.

"(c) *Sharing of profits but not necessarily of losses*—there must be an express or implied agreement for the sharing of profits (*aside from profits received in payment of wages as an employe*) but not necessarily of the losses.

"(d) *Contract*—there must be a contract, whether express or implied, showing that a joint adventure was in fact entered into."

See, also, Treichel v. Adams, 280 Minn. 132, 158 N. W. 2d 263

(1968); Burdick v. Bongard, 256 Minn. 24, 96 N. W. 2d 868 (1959); Sowada v. Motzko, 256 Minn. 395, 98 N. W. 2d 182 (1959); 48 C. J. S., Joint Adventures, § 2; 46 Am. Jur. 2d, Joint Ventures, §§ 7-12; 10A Dunnell, Dig. (3 ed.) §§ 4948b to 4949c.

The trial court upon reconsidering this issue held that since there was no joint venture, but rather a situation at least analogous to a master-servant relationship, the controlling case would be Weber v. Stokely-Van Camp, Inc. 274 Minn. 482, 144 N. W. 2d 540 (1966). In that case, this court considered the traditional notions of imputed contributory negligence in automobile cases and abolished the rule that the negligence of a servant is imputed to a master so as to bar his recovery against a negligent third party. We did so after employing ordinary principles supporting the conclusion that if the relationship exists because of control exercised by the master over the servant, such control is wholly conflicting with the theory of imputation of negligence to one who is theoretically blameless. The Weber case held that the abolition of imputed contributory negligence in master-servant cases was prospective only.

The rule abolishing imputed contributory negligence was extended to joint enterprises, again with prospective application only, in the case of Pierson v. Edstrom, 286 Minn. 164, 174 N. W. 2d 712 (1970), where the court held that Weber was not intended to govern joint-enterprise cases.

It therefore appears that, utilizing the tests defined as conclusive in determining whether a joint-enterprise relationship exists, there is here no joint venture. Applying the standards set forth in Rehnberg, the elements of control, contract, and sharing of profits remain unsatisfied here. Nowhere does the evidence establish that Bray was other than a gratuitous volunteer, that Citurs directed the physical operations of the truck, or that there was a joint benefit derived from the venture. See, Pierson v. Edstrom, *supra,* where this court concluded that two elements are necessary for a joint enterprise, i. e., mutual undertaking for a common purpose and a right which need not be exercised to

a voice in the direction and control of the means used to carry out the common purpose. The evidence is insufficient to establish these elements, admittedly less comprehensive than those set forth in Rehnberg. Therefore, the fact that the accident occurred prior to the prospective enunciation in Pierson should not be determinative in what is conclusively not a joint venture.

The sole problem remaining then is a precise classification of the relationship of the parties. It is an unwarranted extension of the master-servant doctrine to conclude that such is established by the facts presented.

Therefore, if there is neither a master-servant relationship nor a joint enterprise, there would be no necessity or basis for imputation of negligence and defendant's contention is without merit. We therefore hold that neither a joint enterprise nor a master-servant relationship existed here.

Affirmed.