STATE of Minnesota, Appellant,

v.

Lucas Lee SMITH, Respondent.

STATE of Minnesota, Appellant,

v.

Lyndon Lee SMITH, Respondent.

No. 47828.

Supreme Court of Minnesota.

Dec. 16, 1977.

Warren Spannaus, Atty. Gen., William B. Randall, County Atty., Steven C. DeCoster, Asst. County Atty., St. Paul, for appellant.

Charles A. Williams, Jr., Asst. County Public Defender, St. Paul, for Lucas Lee Smith.

James T. Hankes, Asst. County Public Defender, St. Paul, for respondent.

TODD, Justice.

This is a pretrial appeal by the state, pursuant to Rule 29.03, Rules of Criminal Procedure, from an order of the district court suppressing physical evidence after an omnibus hearing in the prosecution of defendants for two counts each of felonious theft. Issues raised by the appeal relate to the plain-sight and the search-incident-to-arrest exceptions to the general rule prohibiting warrantless searches and seizures. We affirm the suppression order in part and reverse it in part, and remand the case for trial.

At 11:30 p. m. on February 22, 1977, two St. Paul policemen were dispatched to a high-rise apartment building to assist a young mother in a domestic matter. The woman, who talked with the officers outside the building, explained that she and her son had lived with defendants Lucas Lee Smith and his brother Lyndon Lee Smith in an apartment in the building for several months and that Lucas had regular-

ly cared for her son when she was at work. She explained further that she and Lucas had had an argument and she had decided to leave but that he was refusing to let her take her son and had threatened to give the boy to someone else. She gratuitously informed the officers that the apartment was filled with stolen stereo equipment and warned them that Lucas had a gun which he had used to commit crimes in Minneapolis and which he kept under a mattress in the apartment.

Unable to get the people inside the apartment to open the door and return the boy to his mother and fearing a barricaded hostage situation, the officers called their supervisor, who with two other officers soon arrived at the scene. After repeated unsuccessful attempts to get the people to open the door, the officers forced their way in and made a rapid sweep through the apartment, searching primarily for people but also making a cursory protective search for weapons in the process. In one of the two bedrooms they found defendants and two other men, all of whom they escorted to the small combination living-dining room, where they were searched, handcuffed, and then ordered to sit on the floor. The officers also found the child, asleep and unharmed.

After neutralizing the situation, the officers continued looking for the gun which had been described. They found it and a knife under a mattress in the same room in which the four men were being held.

The officers then began an examination of a number of items which they had seen in plain sight when they made their initial sweep through the apartment. Specifically, they had seen an unusually large amount of stereo and telephone equipment in what was a sparsely furnished apartment. Some of this equipment, as well as an expensive camera, was partially covered with blankets or towels, as if someone hastily had tried to conceal its presence. Some of the equipment was stacked in a corner, much of it apparently was not being used. The post-arrest examination of the items revealed that some of them had obliterated serial

numbers or none at all. Others, for example the camera, had Operation Identification numbers of serial numbers which the officers fed into their computer via the telephone.

The officers seized, in addition to the gun and the knife, only a small portion of the items that were in the apartment—that is, only the items which had obliterated serial numbers or no serial numbers or items which they were able to confirm through their computer as stolen. These items included 1 stereo receiver, 4 speakers, 1 camera, 1 automatic telephone answering set, 2 decor telephones in wood cases, and 1 adding machine. The record indicates that there were many stereo and telephone items which were not seized.

1. In suppressing the items of stolen property seized by the police, the district court reasoned that, although the police lawfully entered the apartment and saw the stolen items in plain sight during their sweep through the apartment, the items should not have been seized without a warrant because the occupants of the apartment were under arrest, the premises were secure, and the police could have gotten a warrant that night or at the latest during the regular hours of court Wednesday morning. In support of this reasoning the court cited *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

The district court's interpretation of the *Coolidge* case is contrary to the interpretation we have given the case, most notably in *State v. Severtson,* 304 Minn. 487, 232 N.W.2d 95 (1975). In *Severtson* the police, while lawfully executing a search warrant for marijuana in the house of a man who had sold marijuana to an undercover agent, discovered papers in plain sight which were immediately recognizable as evidence connecting defendant with drugs found there. Holding that it was unnecessary for the police to get a second warrant before seizing the papers, we stated as follows:

"After careful consideration we hold that the police acted properly in seizing the papers. The rule we have followed in

reaching this conclusion is that where an officer, while lawfully executing a search warrant authorizing the seizure of certain items, comes upon other items that he has probable cause to believe are subject to seizure, he may seize them without first obtaining another warrant. To hold otherwise and require the officer in such a situation to obtain a second warrant would serve no other purpose than that of unnecessary formalism, *Skelton v. Superior Court of Orange County,* 1 Cal.3d 144, 81 Cal.Rptr. 613, 460 P.2d 485 (1969), and we do not believe that the United States Supreme Court would reach such a result. Indeed, in McCormick, Evidence (2 ed.), pp. 389 to 391, the author analyzes *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), as supporting the 'plain view' theory upon which we now rely.

"In prior cases this court has indicated that there must be a strong relationship between the seized items and the described items. See, e. g., *State v. Michaelson,* 298 Minn. 524, 214 N.W.2d 356 (1973). Although one might argue that there is a strong relationship between the papers and the narcotics, we prefer to rely upon the requirement of *Warden v. Hayden,* 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782, 792 (1967), that there be 'a nexus—automatically provided in the case of fruits, instrumentalities or contraband—between the items seized and criminal behavior.' Under this test, it is clear that the officers had probable cause to believe that the papers were seizable because they were immediately facially recognizable as evidence which would connect defendant to the drugs found in the bureau drawer. See, *State v. Garrett,* 7 Or.App. 54, 489 P.2d 994 (1971).

"Since the papers came in 'plain view' of the officers while they acted within the scope of a lawful search pursuant to a warrant, and because they had probable cause to believe that the papers were seizable, a seizure of the papers was proper * * *." 304 Minn. 489, 232 N.W.2d 97.

■ Although in the instant case the initial intrusion was not justified by a warrant, the fact does not distinguish this case because, as the *Coolidge* opinion makes clear, the plain-view doctrine applies whenever the initial intrusion that brings the police within the plain view of the incriminating evidence is legal, not just when that intrusion is supported by a warrant.

■ Our conclusion then is that under *Coolidge* the stolen property was properly seized without a warrant if, in fact, the requisites of the plain-sight rule were met, and we hold that they were. We emphasize that when they observed the items in plain sight, the officers were in a position in which they had a legal right to be at that time, and the officers were not unreasonably intruding on anyone's reasonable expectation of privacy. While the discovery of the items was apparently not inadvertent because the officers had been told that there were stolen items in the apartment, the inadvertency requirement explicated in the *Coolidge* case clearly should not be applied in this case because the primary motivation for entering was other than to seize evidence. See, *United States v. Lisznyai,* 470 F.2d 707 (2 Cir. 1972), certiorari denied, 410 U.S. 487, 93 S.Ct. 1516, 36 L.Ed.2d 184 (1973). Indeed, the opinion in *Coolidge* emphasized that "it is well to keep in mind that we deal here with a *planned* warrantless seizure." 403 U.S. 471, n. 27, 91 S.Ct. 2041, 29 L.Ed.2d 586.[1] Finally, we believe it fair to conclude, as the district court apparently did, that, because of what they had been told and because of the unusual number of items and the way they were stored, it was immediately apparent to the

officers that the items they saw in plain sight were subject to seizure. See, *State v. Streitz,* Minn., 258 N.W.2d 768, filed September 23, 1977.[2] They therefore acted reasonably in physically examining the items to determine whether their serial numbers were obliterated or whether it would be possible to trace the items to their true owners. Id.

Because the requisites of the plain-sight rule were met, the district court erred in holding that a warrant was necessary before the officers could seize the items.

2. The district court suppressed the gun and the knife apparently on the theory that the postarrest search that produced them exceeded the permissible scope of a search incident to arrest and also on the theory that the weapons were irrelevant to any issues that would develop at trial.

■ We need not decide whether the search exceeded the permissible scope of a search incident to arrest because it is clear that the district court properly ruled that the weapons were irrelevant to any issues that would develop at trial. While normally matters of relevancy are decided at trial, Rule 11.04, Rules of Criminal Procedure,[3] authorizes the district court to decide at the time of the omnibus hearing any evidentiary issue which is ripe for decision. Here it was obvious to the court that the weapons would have no relevance to any of the issues which might be presented at the trial of the felonious theft charges, and the court therefore appropriately ordered the evidence suppressed and avoided the possibility of any prejudicial display of or reference to the weapons at trial.

1. Also, as we indicated recently in *Johnson v. State,* Minn., 256 N.W.2d 78 (1977), there is doubt about the precedential value of the inadvertency language in the *Coolidge* opinion, since only 4 of the 9 justices signed that part of the opinion. Further, as we also stated in *Johnson,* the *Coolidge* opinion appears to except contraband, stolen goods, and objects dangerous in themselves from the inadvertency requirement.

2. In *Streitz* we held that in determining whether the stolen nature of the property observed in plain sight is immediately apparent, the police

may consider such things as any background information they have which casts light on the nature of the property and whether the items are unusual in number or are strangely stored or located.

3. Rule 11.04, Rules of Criminal Procedure, provides: 'The [omnibus] court shall ascertain any other constitutional, evidentiary, procedural or other issues that may be heard or disposed of before trial and such other matters as will promote a fair and expeditious trial, and shall hear and determine them, or continue the hearing for that purpose."

Affirmed in part, reversed in part, and remanded for trial.