**Loren J. PIETILA, Trustee for the Heirs of Velma K. Pietila, Decedent, Respondent (C5–83–591), Appellant (C0–83–613),**

v.

**Thomas E. CONGDON, Salisbury Adams and William P. Van Evera, Individually and as Trustees under the Will of Chester A. Congdon, Deceased, Appellants (C5–83–591), Respondents (C0–83–613),**

**First Bank (N.A.) Duluth, as Executor of the Estate of Elisabeth M. Congdon, Deceased, and William P. Van Evera, as Conservator of the Estate of Elisabeth M. Congdon, Deceased, and Congdon Office Corporation, Inc., Respondents.**

No. C5–83–591, C0–83–613.

Supreme Court of Minnesota.

Feb. 15, 1985.

Gerald J. Brown, Brown, Andrew, Hallenbeck, Signorelli & Zaller, P.A., Duluth, for trustees.

Bruess, Bye, Boyd, Andresen & Sullivan, David P. Sullivan, Duluth, for Pietila's.

Halverson, Watters, Bye, Downs & Maki, Ltd., Anthony S. Downs, and Nancy L. Gores, Duluth, for 1st Bank.

COYNE, Justice.

This wrongful death action arises out of the brutal murders of Elisabeth M. Congdon and her personal nurse, Velma K. Pietila, sometime during the late night hours of June 26, 1977, or the early morning hours of June 27, 1977. The plaintiff, as trustee for the heirs of Velma Pietila, alleges that one or more of the several defendants negligently failed to provide adequate security for Mrs. Pietila's protection. The jury found that the trustees under the will of Chester A. Congdon, the conservator of the estate of Elisabeth M. Congdon, and the co-conservators of Miss Congdon's person[1] all were negligent and that Elisabeth Congdon was not negligent. The jury determined, however, that only the negligence of the trustees was a direct cause of Mrs. Pietila's death. The trustees have appealed from the judgment in favor of the plaintiff in the amount of $225,000, and the plaintiff has noticed review of the determination that Elisabeth Congdon was not negligent and that the negligence of Miss Congdon's conservators was not a cause of Mrs. Pietila's death. We reverse in part and affirm in part.

This action is grounded on a theory of negligent failure to provide adequate security for the protection of Mrs. Pietila while she was working at Glensheen, an estate on the shore of Lake Superior at Duluth. Glensheen—with its manor house of 39 rooms and servants' quarters, several accessory buildings, lawns and gardens—was built shortly after the turn of the century by Chester A. Congdon. On Chester Congdon's death, Glensheen passed to Clara, his wife, for her lifetime, then to his trustees to be held pursuant to the trust created by his will until the death of the last survivor of Chester's six children. The will provided for the equal use of Glensheen by those of Chester's children and their families who chose to live in or visit Glensheen and also provided that, in the event of discord, unmarried children should have a right of occupancy to the exclusion of married children.

The youngest of Chester's children, Elisabeth, never married. Elisabeth and her mother resided in Glensheen until Clara's death in 1950. Elisabeth, who had lived in Glensheen since its completion when she was 14 years old, continued to make Glensheen her permanent home. Miss Congdon reared her two adopted daughters, Marjorie and Jennifer, there. In 1964 a massive stroke left Miss Congdon partially paralyzed and suffering from aphasia.

Despite her infirmities, Miss Congdon handled her own affairs until September 1974, when she petitioned for the appointment of William P. Van Evera, one of the trustees under her father's will, as the conservator of her estate and the appointment of her personal physician, Dr. Elizabeth Bagley, and her personal manager, Vera Dunbar, as co-conservators of her person. According to the testimony, Miss Congdon was urged to petition for the appointment of these conservators by family members who became concerned for her welfare after incidents involving her daughter, Marjorie Caldwell.

Until her death at age 83 years Miss Congdon remained at Glensheen in the around-the-clock care of private duty nurses. Velma Pietila served for many years as one of Miss Congdon's nurses. Although Mrs. Pietila, who was 66 years old, had retired from nursing a month earlier, she returned to Glensheen as a substitute nurse on the night of the murders.

There was very little evidence of the way the murders were committed. Although photographs of Glensheen, including a photograph of a broken basement window, were introduced, it was stipulated that the murders were committed by a "person or

---

1. Although the co-conservators of Miss Congdon's person were not parties to the action, questions concerning their conduct were included in the special verdict.

persons unknown, who gained unauthorized and illegal entry to the home known as Glensheen." The thrust of the plaintiff's case was that the trustees under Chester Congdon's will were the possessors of Glensheen. Directing our attention to *Peterson v. Balach*, 294 Minn. 161, 199 N.W.2d 639 (1972), in which we abolished the traditional distinctions between the duty a landowner owes to invitees and that owed to licensees, the plaintiff contends that as possessors of land the trustees were required to exercise reasonable care to protect Mrs. Pietila, an entrant to the land, from harm, including harm from the criminal activities of unidentified third persons.

The plaintiff equates legal title with possession, asserting that as the holders of title to Glensheen the trustees were occupants of Glensheen and, hence, subject to the duties imposed on the possessors of land. There is, however, no evidence that the trustees occupied Glensheen with the intent to control it or even that they had the right to do so. The interest of the trustees in Glensheen was, of course, subject to the terms of the trust created by Chester Congdon's will. While the will accorded the trustees "absolute power" to sell and convey Glensheen in fee, that "absolute power" was exercisable only with the concurrence of Chester's then surviving children. In 1968 the trustees—with Elisabeth's approval—conveyed Glensheen to the University of Minnesota, reserving to the trustees an estate measured by the life of Elisabeth Congdon, who was then the sole survivor of Chester's children. At best, control of the property was divided between the trustees and Chester's issue.

The plaintiff also contends that the trust instrument required the trustees to maintain Glensheen in good repair, thus imposing on the trustees the duties of a possessor of land. The will contains these directions with respect to the operation and maintenance of Glensheen:

During the life of my wife my said trustees shall maintain Glensheen in a good state of repair, and pay taxes, assessments and insurance thereon, as a part of the current expenses of my estate, and shall pay to my wife to defray the running expenses of Glensheen the sum of twenty-five thousand dollars per annum, in quarterly installments.

During the period in which said property is held in trust, the expenses of repairs, taxes, assessments and insurance shall be similarly defrayed, and the same allowance or appropriation made for running expenses, which latter fund shall be directly applied by the trustees to defray the running expenses of Glensheen except as a majority of my surviving children may from time to time agree upon one or more of their number residing in Glensheen, to whom such current expense fund shall be paid, and who shall take charge of its application, in which case such payments shall be made to such person or persons, who receipts for the same shall absolve the trustees from further responsibility therefor.

While the will imposed on the trustees the duty to maintain Glensheen in a good state of repair and to pay taxes and insurance during Clara's lifetime, after her death, when Elisabeth claimed the occupancy of Glensheen in her own right, the trustees' obligations were to defray—i.e., to pay—the expenses of repair, taxes, and insurance as part of current expenses and to provide $25,000 each year to defray the running expenses of Glensheen. After Mrs. Congdon's death, the trustees paid the current expense fund to the Congdon Office Corporation, which handled Miss Congdon's business affairs. Miss Congdon augmented the funds provided by the trustees by $50,000 each year in order to defray the actual running expenses of Glensheen.

■ No doubt the trustees had a right of entry to Glensheen, but in view of Elisabeth Congdon's occupancy of Glensheen, her unquestionable right to control both the use and disposition of the property during her lifetime and to order repairs at the expense of the trust, and in view of the absence of any express direction to the trustees to do more than pay the expense

of repairs, the trustees cannot be said to have had that exclusive control over Glensheen which would justify characterizing them as possessors of land for purposes of tort liability. Restatement (Second) of Torts, § 328 E. (1965); *Isler v. Burman,* 305 Minn. 288, 232 N.W.2d 818 (1975).

Even if the will were construed to charge the trustees with the maintenance and repair of Glensheen after Mrs. Clara Congdon's death, we hold that the failure to prevent the murder of Miss Congdon and Mrs. Pietila did not constitute a breach of their obligations, whether those obligations were imposed by the will or arose out of the status of the trustees with respect to the land. The plaintiff asserts that the trustees were required to protect the physical integrity of Glensheen and its furnishings, that Glensheen was a 39-room mansion situated on large grounds and constructed at enormous cost, that the house and its furnishings demonstrated the presence of wealth, and that, therefore, an unauthorized or unlawful intrusion for wrongful purposes was reasonably foreseeable by the trustees.

The evidence was that despite its size, cost, and aura of wealth, in the almost 70 years of its existence Glensheen had never been invaded by burglars, robbers, or vandals. Glensheen was not situated in a high crime area—there had been only a single reported criminal incident in the area some 6 or 7 years earlier. The only evidence which suggested the risk of harm from the actions of third persons was evidence (to which the defendants strenuously objected) that family members had urged the appointment of conservators for Miss Congdon because she had guaranteed Marjorie Caldwell's promissory notes in excess of $450,000; that 2 or 3 years before the murders Marjorie brought a gift of marmalade to her mother, made a sandwich for her, Miss Congdon fell asleep, and a blood test indicated the presence of a drug not among the drugs prescribed for Miss Congdon; that Marjorie Caldwell once made an unannounced visit and ordered Mrs. Pietila from the room; and, finally, that there was a rumor from Colorado that Marjorie Caldwell was looking for a "hit man." There was also evidence of Marjorie Caldwell's conduct with other persons. To the extent that the evidence signaled danger, it was a risk of harm directed solely toward the person of Elisabeth Congdon, not to Glensheen. And when harm did befall Miss Congdon and Mrs. Pietila at the hands of a person or persons unknown, Glensheen was not damaged.

As the Supreme Court of New Jersey remarked in *Goldberg v. Housing Authority of City of Newark,* 38 N.J. 578, 583, 186 A.2d 291, 293 (1962),

> The question whether a private party must provide protection for another is not solved merely by recourse to "foreseeability". Everyone can foresee the commission of crime virtually anywhere and at any time. If foreseeability itself gave rise to a duty to provide "police" protection for others, every residential curtilage, every shop, every store, every manufacturing plant would have to be patrolled by the private arms of the owner. And since hijacking and attack upon occupants of motor vehicles are also foreseeable, it would be the duty of every motorist to provide armed protection for his passengers and the property of others. Of course, none of this is at all palatable.
>
> The question is not simply whether a criminal event is foreseeable, but whether a *duty* exists to take measures to guard against it.

Although we held in *Peterson v. Balach,* 294 Minn. at 164, 199 N.W.2d at 642, that the duty required of a landowner or other person charged with the responsibility for the condition of the land is to use reasonable care for the safety of all persons invited upon the premises regardless of their status as invitees or licensees, we did not impose new duties on landowners. Certainly, a possessor of land has a duty to exercise reasonable care in carrying on his activities on the land and to so maintain the premises that their physical condition does not expose the visitor to an unreasonable

risk of harm. But we know of no case which imposes upon a homeowner the duty to protect persons invited to his residential premises from the criminal activities of third persons. A criminal act such as murder or armed robbery committed by a person or persons unknown is not an activity of the owner and does not constitute a condition of the land.

Ultimately, of course, whether or not the duty exists is a question of policy. The problems inherent in the imposition of such a duty are succinctly enunciated in *Goldberg v. Housing Authority of City of Newark*, 38 N.J. 578, 589–90, 186 A.2d 291, 297 (1962):

> Fairness ordinarily requires that a man be able to ascertain in advance of a jury's verdict whether the duty is his and whether he has performed it. * * * And if the prescient owner concludes the duty is his, what measures will discharge it? It is an easy matter to know whether a stairway is defective and what repairs will put it in order. Again, it is fairly simple to decide how many ushers or guards will suffice at a skating rink or a railroad platform to deal with the crush of a crowd and the risks of unintentional injury which the nature of the business creates, but how can one know what measures will protect against the thug, the narcotic addict, the degenerate, the psychopath and the psychotic? Must the owner prevent *all* crime?

Inasmuch as no police force has ever achieved that goal, the plaintiff cannot intend the imposition of an absolute obligation to prevent all crime. Whatever unarticulated degree of effectiveness short of perfection may be intended, we know of no standard of performance to which the owner can look for guidance before the crime and by which his conduct can be measured after the crime. Moreover, the jury's determination whether the security measures were adequate or inadequate would be further complicated by the circumstance that its decision would be required only if the security had in fact proved to be inadequate. *7735 Hollywood Boulevard Venture v. Superior Court, Los Angeles Co.,* 116 Cal.App.3d 901, 905, 172 Cal.Rptr. 528, 530 (1981).

Finally, even if a duty to provide protection were recognized, the question of causation would remain unanswered. The plaintiff contends that the failure of the defendants to install a security alarm system in Glensheen or to hire bodyguards to protect Elisabeth Congdon caused the murders. It was, however, for the plaintiff to prove by a preponderance of the evidence that the defendant's conduct was a proximate cause of the two deaths, and while a causal link can be made by circumstantial evidence, the proof must be something more than merely consistent with the plaintiff's theory. *See E.H. Renner & Sons, Inc. v. Primus*, 295 Minn. 240, 243, 203 N.W.2d 832, 835 (1973).

The record contains only the stipulation that "Velma Pietila and Elisabeth Congdon were murdered on the night in question by a person or persons unknown, who gained unauthorized and illegal entry to the home known as Glensheen." Although two other women, the cook and the maid, were present in the house, there were no eyewitnesses to the crime. The record does not disclose the number of intruders or how the murders were committed. It is apparent that the security measures in force at Glensheen—the standard locks on doors and windows; the presence of four people in the main house; the presence in separate living quarters on the estate of two male employees, the chauffeur and the gardner, who could be summoned by telephone; the private security service which had contracted to send units to Glensheen in response to any call for assistance—were ineffectual to prevent these murders. While there was evidence that it was possible to equip Glensheen with a security alarm system and to station bodyguards in the house and that either or both were economically feasible measures, there was no evidence that either measure or both would have prevented the murders. The record does not tell us whether the murders were committed by one person who might have been deterred by security alarms or bodyguards or

by an organized team that was fully prepared to deal with security alarms and bodyguards. That a skilled and dedicated troop of bodyguards equipped with the most sophisticated weaponry and electronic devices does not always restrain even one man bent on murder is all too familiar to a generation which has witnessed the assassination of one United States president and the near fatal shooting of another.

■ The extraordinary speculation inherent in the subject of deterrence of crime is illustrated by the verdict in this case. The jury found that the trustees under the will of Chester A. Congdon, who were required to defray the expense of maintaining Glensheen, and the conservators of the person and estate of Elisabeth Congdon, who had the duty to provide for Miss Congdon's care, comfort and maintenance needs, including shelter and nursing care, were all negligent. While the jury determined that the negligence of the trustees, one of whom was William P. Van Evera, was a proximate cause of the murder of Mrs. Pietila, the jury determined that the negligence of the conservators, one of whom was the same William P. Van Evera, was not. The question of the causal relationship between a crime and the failure to prevent it is usually cast in terms of superseding or independent intervening cause. *See Hilligoss v. Cross Companies,* 304 Minn. 546, 228 N.W.2d 585 (1975); *Anderson v. Theisen,* 231 Minn. 369, 43 N.W.2d 272 (1950). Inasmuch, however, as the theory of the plaintiff's case is that the defendants' negligence lay in their failure to prevent this crime, resort to superseding cause would be begging the question. We hold instead that neither the trustees, the conservators nor Elisabeth Congdon had a duty to take measures to guard against the murders perpetrated on June 26 or 27, 1977, and that the record does not permit a finding based on real deduction that the failure to take measures in addition to those in force was a proximate cause of the murders. *Smith v. Kahler Corp., Inc.,* 297 Minn. 272, 276, 211 N.W.2d 146, 149 (1973).

Accordingly, we reverse that portion of the judgment awarding the plaintiff damages from the trustees under the will of Chester Congdon and affirm that portion of the judgment in favor of the conservators of the person and estate of Elisabeth M. Congdon and the executor of her estate.

Reversed in part and affirmed in part.

YETKA, Justice (dissenting).

I dissent because I believe the trustees had a duty to render the premises safe from foreseeable risk of harm. This court has clearly defined that duty:

> *The duty required of a landowner (or the person charged with responsibility for the condition of the land) as to licensees and invitees is no more and no less than that of any other alleged tortfeasor, and that duty is to use reasonable care for the safety of all such persons invited upon the premises, regardless of the status of the individuals.*

*Peterson v. Balach,* 294 Minn. 161, 174, 199 N.W.2d 639, 647 (1972) (emphasis added). The trust agreement charges the trustees with responsibility for the condition of Glensheen. The fact that their power to control was shared with any surviving children of Chester Congdon does not mitigate the fact that they were charged with responsibility for the condition of the land and had a duty to exercise reasonable care for Mrs. Pietila while she worked on the premises.

Exclusive control over the premises is not, as the majority seems to suggest, a prerequisite for a duty to arise. Indeed, in *Isler v. Burman,* 305 Minn. 288, 232 N.W.2d 818 (1975),[1] a church was found to be a "possessor" of property it not only did not own, but only used once for a snowmo-

---

1. The fact situation in *Isler* arose before this court abolished the distinction between licensees and invitees in *Peterson.* The higher invitee standard was used in *Isler. Isler v. Burman,* 305 Minn. 288, 232 N.W.2d 818 (1975). This, however, does not affect the analysis of whether the church was a "possessor" of land since that is a preliminary question to the fixing of the actual standard of care.

bile outing. If the church is a "possessor" of land it borrowed for an evening, the trustees should also be "possessors" of ·Glensheen since they hold title to it and have a specific, albeit shared, responsibility for its upkeep.

Being possessors of the land, they had the duty to exercise reasonable care to protect the safety of those in Glensheen. It is for the jury to decide how much care would be reasonable care. The evidence presented showed that the trustees knew that Elisabeth Congdon might be in danger. Marjorie Caldwell had influenced her mother, Mrs. Congdon, to co-sign notes for $126,000 and $325,000 upon which Marjorie defaulted. It subsequently developed that Marjorie Caldwell owed over $1,000,000 to various creditors.

Marjorie Caldwell's home in Marine on St. Croix burned down under suspicious circumstances, allegedly for insurance. When Marjorie subsequently moved to Colorado, she sought loans at several banks. Having been denied loans, small fires occurred in the bank. One of Marjorie's daughters, Rebecca LeRoy, testified that her mother had tried to kill her by strangulation.

Several years prior to the murder, Marjorie brought some prepared marmalade sandwiches, which Elisabeth Congdon ate and which resulted in Elisabeth's falling asleep and being sleepy for 2 days thereafter. Her personal friend and doctor was convinced that the sandwiches were drugged.

In March 1977, the trustees were informed by the Colorado Bureau of Investigation that Marjorie was looking for a hit man to murder Elisabeth Congdon. In May 1977, a lawyer representing Marjorie Caldwell contacted the trustees and their attorney, bringing a request for funds for Marjorie to the trustees.

Knowing all this, the trustees did nothing to secure Glensheen. The jury determined that something more than nothing was required and that the trustees' inaction was a negligent cause of the murder. Considering the great deference given to jury findings, *Bray v. Chicago, R.I. & P.R. Co.*, 305 Minn. 31, 232 N.W.2d 97 (1975), this jury's findings should be upheld. I would affirm.

WAHL, Justice (dissenting).

I join the dissent of Justice Yetka.