**Thomas C. ROETTGER and Diane D. Roettger, Respondents,**

v.

**UNITED HOSPITALS OF ST. PAUL, INC., Appellant.**

No. C4–85–1283.

Court of Appeals of Minnesota.

Feb. 4, 1986.

Charles Mertensotto, Rowland & Mertensotto, St. Paul, for respondents.

David C. Hutchinson, Geraghty, O'Loughlin & Kenney, St. Paul, for appellant.

Heard, considered and decided by POPOVICH, C.J., and PARKER and RANDALL, JJ.

## OPINION

PARKER, Judge.

This is a negligence action arising from an incident where respondent Diane Roettger was assaulted by a third-party trespasser while an inpatient at appellant United Hospitals of St. Paul, Inc. The jury returned a verdict awarding Diane Roettger $300,000 and her husband, respondent Thomas Roettger, $22,500. United's motion for a new trial or judgment notwithstanding the verdict was denied by the trial court. United appeals, contending that the

jury's verdict and damage award were not supported by the evidence. We affirm.

## FACTS

United Hospitals is a large urban medical complex located in the west end of downtown St. Paul, Minnesota. United's physical plant consists of about 700,000 square feet and in excess of 2,100 rooms. On April 16, 1983, Diane Roettger was admitted into the hospital because she was in labor; her daughter was born the next day.

At about 2:00 a.m. on April 19, 1983, Diane Roettger was alone in her room on the second floor of the hospital. Two floors above, Merle Sue Green and Barbara A. Godes were attempting to sleep in a visitor's lounge. They were at the hospital because their father was seriously ill. Green opened her eyes and noticed a man in the area who was very nervous and couldn't sit still.

After he smoked about three cigarettes, he came up behind Green and tapped her on the shoulder. He told her that a doctor wanted to speak to her in a tunnel leading to Children's Hospital. Green detected the smell of liquor on the man's breath. He walked into the tunnel and appeared to be waiting for her. She did not move. He then walked back into the lounge, sat down and smoked another cigarette. Green woke her sister, Godes, who got up and walked to the nurse's station to inform them about this man who was acting strangely. The man then entered the down elevator and was gone.

It took Godes about four minutes to talk to the nurses and get back to the lounge. Green testified that the security officers came soon after Godes had gone to the nurse's station. While the security person was talking to Green and Godes, he was beeped on his walkie-talkie and paged to go down to the second floor because a disturbance had been reported.

Diane Roettger had been sitting in bed when a man came into her room. He walked around the drape and said, "Oh, excuse me," and then turned around and appeared to leave. She thought he had left, so she turned off her light, but as she did so she heard a sound like a chair moving. She turned her light back on and discovered that the man was still in her room. She asked, "Did your wife just have a baby?" He replied, "Yes," and she asked, "What did she have?" The man said, "A boy." Diane Roettger then sat back in her bed. She could not see the man because the drape was still drawn. She then asked, "How much did the baby weigh?" He said, "Seven ounces." The man then said, "Would you mind if I shut the door? My wife's outside talking to her mother and it's making me real tense." She replied, "No, I wish you wouldn't." She then picked up the telephone beside her bed, and as she picked it up it made a ringing sound.

Moments later, the man came around the drape, leaped spread-eagle, and landed on her. They fell from the bed to the floor. She screamed as the man hit her in the face several times. He put his hand around her neck and she had trouble breathing. She estimated she was hit about 20 times in the face. She was lying flat on her back on the floor with the man straddling her and hitting her head against the floor. She thought the attacker was trying to kill her.

Two nurses then entered the room and pulled the man off. The man ran and escaped from the hospital. Diane Roettger was hysterical. The area around her left eye was badly bruised and swollen, there were marks on her neck, and an earring had been pulled out of her left ear. A cut in her eyebrow required stitches and has left a small scar.

The parties stipulated that the assailant was Charles R. Brown, who is presently committed to St. Peter State Hospital. He was arrested on April 19, 1983, at the Union Gospel Mission and charged with first-degree assault. There is no evidence of how or when Brown entered the hospital prior to the assault.

Brown had been seen inside United at least three times prior to this incident. On December 23, 1982, it was reported that at

4:30 p.m. Brown had been warned to leave the hospital. The security officer's report said, "I believe Brown is a thief and has been stealing from the hospital for the past several months. If found on hospital property he should be arrested." On January 10, 1983, at 9 p.m. Brown had been warned "to stay out of the hospital." On February 10, 1983, nursing personnel at Children's Hospital informed security officers that someone had been sleeping in unoccupied patient rooms. At 10:15 p.m. on February 11, 1983, Brown was watching television in a visitor's lounge on the fourth floor of the hospital. The security officer's report said, "This is the party mentioned by Children's as sleeping in the hospital the past few nights." Brown was arrested for trespassing and transported to police headquarters by a squad car.

At trial United produced the testimony of Lieutenant Jerry McDonald, a 30-year veteran of the St. Paul Police Department and head of security at United; and Richard Hundt, who has been chief of security at Hennepin County Medical Center for seven and a half years. Both offered their opinions that the security procedures and practices at United were adequate and reasonable. McDonald testified that after evening visiting hours were over, two of the hospital's three night security officers were assigned to positions outside the hospital. This left only one officer to cover United's eight floors. The officer on duty did not patrol above the first floor of the hospital between the hours of midnight and 2 a.m. on the morning of April 19, 1983.

Although visitors Green and Godes stayed in the fourth floor lounge almost every night for several weeks after February 15, 1983, they had no recollection of seeing any security officer in the lounge area during the nights they were there. McDonald testified that trespassing arrests of persons other than Brown had been made in the months before April 1983. The monthly security reports prior to April 1983 included incidents of trespass, theft, and undesirable conduct of persons within the hospital. However, McDonald testified that before April 19, 1983, he was unaware

of any incident during the 17 years he had been associated with hospital security in which an intruder such as Brown had assaulted a patient.

Diane Roettger testified that upon returning home she was frightened, insecure, and unable to stay alone as a result of the attack. She was diagnosed by medical experts of both parties as suffering from post-traumatic stress disorder. The medical experts did not agree on the prognosis and proper course of treatment for her anxiety.

## ISSUES

1. Did the trial court err in refusing to direct a verdict regarding the adequacy and reasonableness of United's security procedures?

2. Does the evidence support the jury's verdict that United's negligence was the direct cause of respondent's injuries?

3. Was the jury's damage award supported by the evidence?

## DISCUSSION

### I

United acknowledges it had a duty to exercise reasonable care. In *Sylvester v. Northwestern Hospital of Minneapolis,* 236 Minn. 384, 53 N.W.2d 17 (1952), a patient sued a hospital for failing to protect him from injuries caused by the violence of another patient who was intoxicated. The trial court directed a verdict for the defendant hospital. The supreme court reversed, holding that the hospital had a duty of reasonable care, measured by the vulnerability of the patient and the foreseeability of the danger:

A private hospital, although it is not an insurer of the safety of a patient, must exercise such reasonable care for the protection and well-being of a patient as his known physical and mental condition requires or as is required by his condition as it ought to be known to the hospital in the exercise of ordinary care. As to the danger of self-injury or as to the danger

reasonably to be anticipated from the acts of another person under the hospital's control, the reasonable care to be exercised must always be in proportion to the patient's inability to look after his own safety. The standard of reasonable care is that which would be exercised by a reasonably prudent person under the same or similar circumstances and does not require the taking of precautionary measures to avert a danger which a reasonable person would not anticipate as likely to happen.

*Id.* at 386, 53 N.W.2d at 19 (footnotes omitted).

United argues that it was entitled to a directed verdict because the Roettgers failed to introduce any expert opinion that the hospital had negligently failed to provide adequate security procedures. The Roettgers called a witness who testified on the availability and function of various security devices on the market. However, the trial court ruled that the witness was not competent to give an expert opinion on the ultimate question of United's negligence.

The problems inherent in the imposition of a private policing duty were discussed by the supreme court in the recent case of *Pietila v. Congdon,* 362 N.W.2d 328 (Minn. 1985). *Pietila* arose from the infamous Glensheen mansion murders, in which Elizabeth Congdon and her personal nurse were killed. In *Pietila* a jury found that the defendants had failed to provide adequate security at Glensheen. Noting that "extraordinary speculation inherent in the subject of deterrence of crime is illustrated by the verdict in this case," the supreme court reversed, holding that the defendants had no duty to guard against the murders. *Id.* at 334. *Pietila* is easily distinguished from the present case; it involved a private residence where the defendants neither acknowledged nor undertook any special duty to deter crime on the premises. Here, United is a large urban hospital that had hired a security staff to protect its patients and employees.

■ Expert testimony is not always necessary to establish negligence. *Tiemann v. Independent School District # 740,* 331 N.W.2d 250, 251 (Minn.1983). The test of whether expert testimony is required is whether "the matter to be dealt with is so esoteric that jurors of common knowledge and experience cannot form a valid judgment as to whether the conduct of the parties was reasonable." *Butler v. Acme Markets, Inc.,* 89 N.J. 270, 283, 445 A.2d 1141, 1147 (1982) (citing 2 Harper & James, *Law of Torts* § 17.1, at 966 (1956)).

■ The jurors in this case heard extensive testimony regarding the security procedures in effect at United Hospitals. They also heard testimony that trespassers had been seen in the hospital above the first floor. Under these facts, the jurors were competent to apply the *Sylvester* standard and determine whether United's security measures were reasonable. *See Isaacs v. Huntington Memorial Hospital,* 38 Cal.3d 112, 132–33, 695 P.2d 653, 663, 211 Cal.Rptr. 356, 366 (1985) (it is for the jury to decide whether the security measures were reasonable under the circumstances). Although the security chiefs of United and Hennepin County Medical Center offered their opinions that United's security was adequate, the jury was entitled to reach a different conclusion based on their independent evaluation of the evidence. *See, e.g., Costello v. Johnson,* 265 Minn. 204, 211, 121 N.W.2d 70, 76 (1963); *Cameron v. Evans,* 241 Minn. 200, 204, 62 N.W.2d 793, 796 (1954).

## II

■ United has argued in its post-trial motions and on appeal that the jury's verdict is not supported by the evidence. Specifically, United alleges that there is insufficient evidence to support the jury's special verdict that the hospital's negligence was the direct cause of Diane Roettger's injuries.

The standard of review on appeal of a denial of a motion for judgment notwithstanding the verdict or for a new trial is a narrow one. In *Vanderweyst v. Langford,*

303 Minn. 575, 228 N.W.2d 271 (1975), the supreme court outlined the standard to be applied when the jury has issued a special verdict on causation:

> The question of proximate cause is normally for the jury to decide, and its decision will stand unless manifestly and palpably contrary to the evidence viewed as a whole and in the light most favorable to the verdict. It is only where the evidence is so clear and conclusive as to leave no room for differences of opinion among reasonable men that the issue of causation becomes one of law to be decided by the court. * * * The question becomes, then, whether or not, when the testimony is viewed in the light most favorable to defendant, the jury's verdict can be reconciled in any reasonable manner consistent with the evidence and its fair inferences.

*Id.* at 576, 228 N.W.2d at 272 (citations omitted).

Although our standard of review is narrow, the recent cases of *Pietila* and *Rullman v. Fisher*, 371 N.W.2d 588 (Minn.Ct. App.1985), suggest that the issue of causation should be closely scrutinized in cases involving allegations of inadequate security.

In *Rullman* a guest at a tenant's New Year's Eve party brought an action against a landlord after she was criminally assaulted by a trespasser who had posed as another guest. In affirming the trial court's grant of summary judgment in favor of the landlord, this court stated:

> On the issue of causation, the plaintiff must produce evidence 'which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.'

*Id.* at 590 (quoting W. Prosser, Handbook of the Law of Torts § 41, at 241 (4th ed. 1971) (footnotes omitted)).

The requisite causal connection between the landlord's alleged breach of duty in failing to provide a deadbolt lock or buzzer system and the criminal assault was not shown. This court noted that the tenant intentionally allowed the door to remain unlocked, the assailant was at the party for some time before the attack, and although recognized as a stranger, was not questioned or asked to leave. Under those circumstances, this court held that it was mere speculation to argue that the lack of a buzzer system was a substantial factor in causing the assault. *Id.* at 590.

In *Pietila* the supreme court stated that "[w]hile there was evidence that it was possible to equip Glensheen with a security alarm system and to station bodyguards in the house, and that either or both were economically feasible measures, there was no evidence that either measures or both would have prevented the murders." *Id.*, 362 N.W.2d at 333. The court concluded that "the record does not permit a finding based on real deduction that the failure to take measures in addition to those in force was a proximate cause of the murders." *Id.* at 334.

In *Pietila* the plaintiffs' showing on causation was exceptionally weak because the record did not disclose the number of intruders or how the murders were committed. The court noted:

> The record does not tell us whether the murders were committed by one person who might have been deterred by security alarms or bodyguards or by an organized team that was fully prepared to deal with security alarms and bodyguards.

*Id.* at 333, 334.

Here, the jury did not have to engage in such broad speculation to reach a verdict. The parties stipulated that Charles Brown was the individual who assaulted Diane Roettger. Brown was openly in a fourth floor lounge with liquor on his breath, pacing, smoking cigarettes, and disturbing

hospital visitors before the assault. The uncontradicted evidence shows that the same man had previously been arrested for sleeping in empty rooms and watching television in a fourth floor lounge at United Hospital.

Nevertheless, the sole security guard assigned to patrol the interior of the hospital did not patrol above the first floor on the morning of the assault. Merle Green and Barbara Godes testified that they did not recall seeing a security officer during the many nights they were in the hospital over a two-month period. Although United's expert testified that people were the key to security, hospital staff testified that they never received any information that Brown or other trespassers had been seen on patient floors.

The jury was given the correct definition of direct cause and instructed that it was not to engage in speculation or conjecture. Noting our narrow standard of review, we hold that the evidence was sufficient for the jury to conclude that United's failure to provide adequate security on its patient floors was a substantial factor in bringing about Diane Roettger's injuries. *See Virginia D. v. Madesco Investment Corp.*, 648 S.W.2d 881 (Mo.1983) (plaintiff is not obliged to prove that the utilization of security measures would surely have prevented the assault); *Mayer v. Housing Authority of Jersey City*, 84 N.J.Super. 411, 425–26, 202 A.2d 439, 447 (1964); *Orlando Executive Park, Inc. v. P.D.R.*, 402 So.2d 442 (Fla.Dist.Ct.App.1981).

## III

■ A trial court is granted the broadest possible discretion in determining whether a new trial should be granted on a claim of excessive damages. On appeal from a denial of a motion for a new trial, the evidence must be viewed in the light most favorable to the verdict, and that verdict should stand unless manifestly and palpably contrary to the evidence. *See Dailey v. Wiborg*, 366 N.W.2d 736 (Minn. Ct.App.1985).

■ There is ample evidence on the record to support the jury's verdict as to damages. The testimony and photographic exhibits reveal that Diane was brutally beaten around the face and suffered serious physical injuries. Furthermore, it is undisputed that Diane has suffered from post-traumatic stress disorder and that her psychiatric prognosis is uncertain. Given our narrow scope of review and the fact that the assault occurred less than two days after Diane Roettger had given birth, we hold that the jury's award of damages is not contrary to the evidence.

## DECISION

The trial court did not err in denying appellant's motion for a new trial or judgment notwithstanding the verdict. The evidence was sufficient to sustain the jury's verdict that United Hospital's failure to provide adequate security was a direct cause of Diane Roettger's injuries. The jury's award of damages was also supported by the evidence.

Affirmed.