STATE of Minnesota, Respondent,

v.

Danna Rochelle BACK, Appellant.

No. A08–17.

Supreme Court of Minnesota.

Dec. 10, 2009.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for respondent.

Rachel F. Bond, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

GILDEA, Justice.

A Hennepin County jury found appellant Danna Back guilty of manslaughter in the second degree in violation of Minn.Stat. § 609.205(1) (2008),[1] in connection with the death of Daniel Holliday. Back appealed her conviction to the court of appeals, arguing that the evidence was insufficient to prove her guilt beyond a reasonable doubt, and challenging the denial of her motion for a new trial. In an unpublished opinion, the court of appeals rejected both of these claims. *See State v. Back*, No. A08–0017, 2009 WL 910756 (Minn.App. Apr. 7, 2009). We granted Back's petition for review on her sufficiency of the evidence claim. Because we conclude that the evidence was not sufficient to support Back's conviction, we reverse.

The facts produced at trial established that in the early morning hours of January 1, 2007, Nicholas Super shot and killed Daniel Holliday.[2] Back and Holliday had been dating off and on for several years. They began living together in 2003, in a house they bought from Holliday's parents. But soon after moving in together, their relationship deteriorated, and they began to argue frequently. By the summer of 2006, Back moved out of the house she and Holliday owned, and into her grandmother's house.

During the summer of 2006, Back also dated Super. Back was aware that there was tension between Holliday and Super. Back told police that Super threatened Holliday with a gun several times. The most significant of these threats occurred when Back stayed overnight at Holliday's house. Super drove by the house and fired shots at the garage. Back explained that she believed that Super fired those shots because he was jealous of Back being with Holliday.[3]

Back told police that Holliday was the "love of my life," and that she wanted to get back together with Holliday. She called Holliday when she returned to her grandmother's house around 3:00 a.m. on the day of the murder, after being out with other friends to celebrate New Year's Eve. When Back reached Holliday, he was at home celebrating with a group of friends. Back believed that she heard women's voices in the background and this upset her. Holliday told her to come over, so she called a number of friends trying to find someone to give her a ride. After she was unable to find anyone else to give her a ride, Back called Super and he agreed to drive her to Holliday's house.

1. This statute provides that a person is guilty of second-degree manslaughter if the person causes the death of another "by the person's culpable negligence whereby the person creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another." Minn.Stat. § 609.205(1).

2. Super has been convicted of second-degree intentional murder for killing Holliday and his appeal is currently pending before the court of appeals. *State v. Super*, No. A09–242.

3. Back did not testify at trial, but police conducted a videotaped interview with her after the shooting. This interview was played for the jury during trial.

After Super picked Back up, they drove his roommate, D.S., back to the apartment D.S. and Super shared. D.S. had been out with Super that night and testified that, while Super sometimes brought a gun with him when he went out, he did not know whether Super had a gun with him that night. D.S. also testified that when Super took a gun with him, he would keep it under the seat of his car. D.S. testified that when they picked Back up, she appeared "angry" and wanted to "fight some girls that were over [at Holliday's house]."

After leaving D.S. at his apartment, Super drove to Holliday's house. Back got out of the car while it was parked in the alley behind the house. When Super dropped Back off, he told her that she and Holliday "better not start arguing." In her police interview, Back stated that she believed Super would simply drop her off and drive away. But Super remained outside Holliday's house, apparently in the alley, after Back went into the house.

Witnesses who were at Holliday's house testified that Back seemed angry when she entered the house and that she threw a beer bottle down the stairs of the house. When Back came into the living room, she saw B.S., who was sleeping on a couch. Back reportedly slapped B.S.'s face. When B.S. asked her why she did that, Back said "because [I] can." B.S. testified that while he thought that Back was acting like there would be "some kind of conflict," she was not acting as though she thought somebody was going to be shot.

Shortly after Back arrived, Holliday and Back started arguing. Holliday repeatedly asked Back to leave, and later grabbed Back by the arm to take her out on the deck. As Holliday was removing Back from the house, Holliday saw that Super was outside. Holliday reportedly yelled

"[C]ome take your girlfriend. Why did you bring her over here? It's not my girlfriend." As Super and Holliday were arguing, Holliday extended his arm, apparently in an effort to push Super off the stairs leading from the yard to the deck, and Super shot Holliday. R.J., one of the neighbors, awoke to hear a female voice screaming, "Stop, Nicky, stop. Stop, Nicky, stop."

Super fled the scene immediately after the shooting. Back stayed with Holliday, performing CPR with one of his roommates until police arrived. Despite efforts to save his life, Holliday died at the scene.

In the police interview after the shooting, Back stated that she did not know that Super had a gun the night of the shooting. She did say, however, that she was aware that Super was "known to pull his gun out on anybody." Back described one incident in which a man came up and hit Super at a bar and Super drove off, firing his gun as he did so. Back explained that, while she was not sure where Super kept his gun, she believed that he used to keep his gun at his parents' house. She also said that Super had dropped her off at Holliday's house before without incident and that she believed he would do so again on the night of the shooting.

Following Holliday's death, a grand jury indicted Back for first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2008), first-degree domestic abuse murder, Minn.Stat. § 609.185(a)(6)(c) (2008), and second-degree intentional murder, Minn.Stat. § 609.19, subd. 1(1) (2008).[4] During the trial, the State moved to dismiss the first-degree premeditated murder charge, and the district court granted Back's motion for acquittal on the first-degree domestic abuse murder charge and

---

**4.** The indictment charged Back with murder based on her "acting alone or intentionally aiding, advising, hiring, counseling or conspiring with" Super.

the second-degree intentional murder charge. The court also granted the State's motion to amend its complaint to include the lesser-included offense of second-degree manslaughter, Minn.Stat. § 609.205(1). The jury subsequently found Back guilty of second-degree manslaughter based on culpable negligence.

### I.

■■■ On appeal, Back argues that the evidence was insufficient to support her conviction. When considering a claim of insufficient evidence, our review "is limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb,* 440 N.W.2d 426, 430 (Minn. 1989). We will allow the verdict to stand " 'if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that [a] defendant was proven guilty of the offense charged.' " *Bernhardt v. State,* 684 N.W.2d 465, 476–77 (Minn.2004) (alteration in original) (quoting *State v. McCullum,* 289 N.W.2d 89, 91 (Minn. 1979)).

■■■ The jury found Back guilty of second-degree manslaughter under Minn.Stat. § 609.205(1), based on her culpable negli-

gence. Under the statute, a person is guilty of manslaughter if she "causes the death of another ... (1) by the person's culpable negligence whereby the person creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another." Minn.Stat. § 609.205(1). "Culpable negligence" is "more than ordinary negligence" and "more than gross negligence." *State v. Beilke,* 267 Minn. 526, 534, 127 N.W.2d 516, 521 (1964). It is "gross negligence coupled with the element of recklessness." *Id.; see State v. Grover,* 437 N.W.2d 60, 63 (Minn.1989) (explaining that criminal negligence requires more than the negligence giving rise to a civil cause of action).

■■■ A defendant cannot be negligent, culpably or otherwise, unless the defendant has a duty that he or she breached. *See State v. Cantrell,* 220 Minn. 13, 23, 18 N.W.2d 681, 686 (1945) (noting that culpable negligence statute "deal[s] with acts or omission of personal duty resulting in the death of a human being"); *cf. Lubbers v. Anderson,* 539 N.W.2d 398, 401 (Minn. 1995) (explaining that the essential elements of negligence include the existence of a duty). Whether a person has a duty of care "is an issue for the court to determine as a matter of law." *Larson v. Larson,* 373 N.W.2d 287, 289 (Minn.1985); *see also Johnson v. State,* 553 N.W.2d 40, 49 (Minn.1996).[5]

---

**5.** Once a duty of care is established, the State must prove that the defendant breached that duty. Our culpable negligence cases recognize that the analysis of whether the defendant breached a duty of care requires proof of both an objective element and a subjective element. *E.g., State v. Frost,* 342 N.W.2d 317, 320 (Minn.1983). As to the objective element, the State must prove that the defendant's conduct involved a gross deviation from the standard of care that a reasonable person in the actor's situation would observe. *See id.* at 319. If the State proves the objective element, the State must then prove the subjective element

of "recklessness" in the form of an actual conscious disregard for the risk created by the defendant's conduct. *See id.* In addition, for criminal liability to attach, the defendant's breach of duty must be the proximate cause of the victim's death. *See State v. Schaub,* 231 Minn. 512, 519, 44 N.W.2d 61, 65 (1950). Back focuses on the breach and causation elements of negligence in arguing that the evidence is insufficient. While Back did not specifically argue in her briefs that she did not owe a duty to Holliday, lack of a duty is implicit in Back's argument that she did not breach a duty. Moreover, our responsibility

■ Under common law principles, there is generally no duty to protect strangers from the criminal actions of a third party. *See Delgado v. Lohmar,* 289 N.W.2d 479, 483 (Minn.1979) ("Ordinarily, there is no duty to control the conduct of a third person to prevent him from causing physical harm to another unless a special relationship exists, either between the actor and the third person which imposes a duty to control, or between the actor and the other which gives the other the right to protection."); *see also H.B. ex rel. Clark v. Whittemore,* 552 N.W.2d 705, 707–10 (Minn.1996) (holding that a special relationship did not exist between the manager of a mobile home park and the resident children and that therefore the manager did not have a duty to take action to protect the children after they reported being sexually abused by another resident); *Pietila v. Congdon,* 362 N.W.2d 328, 333 (Minn.1985) (reversing jury verdict against trustees of mansion in wrongful death action and stating "we know of no case which imposes upon a homeowner the duty to protect persons invited to his residential premises from the criminal activities of third persons"). This is so because of "[t]he problems inherent in the imposition of" a duty to protect others from the criminal activities of third parties. *Pietila,* 362 N.W.2d at 333. The New Jersey Supreme Court succinctly enunciated these problems in *Goldberg v. Housing Auth. of Newark,* 38 N.J. 578, 186 A.2d 291, 297 (1962), when that court questioned how one could " 'know what measures will protect against the thug, the narcotic addict, the degenerate, the psychopath and

the psychotic.' " *Pietila,* 362 N.W.2d at 333 (quoting *Goldberg,* 186 A.2d at 297).

As our cases recognize however, the law will "impose a duty on A to protect B from C's criminal acts" if there is a "special relationship between A and B." *See Erickson v. Curtis Inv. Co.,* 447 N.W.2d 165, 168 (Minn.1989). In such a relationship, "B has in some way entrusted his or her safety to A and A has accepted that entrustment." *Id.* Because of the relationship, "the harm represented by C is something that A is in a position to protect against," and, as a matter of policy, A "should be expected to protect against" that harm. *Id.; see also Pietila,* 362 N.W.2d at 333. Using this relationship analysis, we have recognized a duty to protect against, or to control, the criminal behavior of third parties in limited circumstances. *See Bjerke v. Johnson,* 742 N.W.2d 660, 667 (Minn.2007) (recognizing that homeowner has special relationship with child invitee sufficient to impose a duty to protect the child from the foreseeable sexual assault of a third party also living in the home); *Erickson,* 447 N.W.2d at 169–70 ("The operator or owner of a parking ramp facility has a duty to use reasonable care to deter criminal activity on its premises which may cause personal harm to customers."); *Ponticas v. K.M.S. Investments,* 331 N.W.2d 907, 911 (Minn. 1983) ("[A]n employer has the duty to exercise reasonable care in view of all the circumstances in hiring individuals who, because of the employment, may pose a threat of injury to members of the public.").[6]

---

is "to decide cases in accordance with law." *State v. Hannuksela,* 452 N.W.2d 668, 673 n. 7 (Minn.1990). Because the existence of a duty is a threshold question of law that is dispositive of the issues raised, we answer that question.

**6.** This is the rule outside Minnesota as well. In the few cases from other jurisdictions in which the defendant was convicted of second-degree manslaughter for the criminal actions of a third party, the courts have found a special relationship exists as a predicate for a finding of criminal negligence. *See Palmer v.*

The State makes no argument that there was a relationship here that would support the existence of a legal duty. Rather, in arguing that Back was culpably negligent, the State focuses on the foreseeability portion of the negligence analysis. *See Erickson*, 447 N.W.2d at 168–69 (noting that the existence of a duty "depends ... on the relationship of the parties and the foreseeable risk involved"). The State contends that because Back knew that Super would pull his gun on "anybody," had previously threatened Holliday with a gun, and was jealous of her relationship with Holliday, it was foreseeable to Back that Super would shoot Holliday.[7]

The State's focus on foreseeability does not resolve the threshold question of Back's duty. As we explained in *Pietila*, the question of whether a person " 'must provide protection for another is not solved merely by recourse to "foreseeability" ' " because the " 'question is not simply whether a criminal event is foreseeable, but whether a *duty* exists to take measures to guard against it.' " *Pietila*, 362 N.W.2d at 332 (quoting *Goldberg*, 186 A.2d at 293).[8]

Because the State seeks to hold Back criminally responsible for the criminal action of a third party, our cases require that the State prove that Back had a special relationship with either Super or with Holliday that gave rise to a duty to control Super or to a duty to protect Holliday against the actions of Super. *See John-*

---

State, 223 Md. 341, 164 A.2d 467, 468, 474 (1960) (holding evidence sufficient to support a conviction for second-degree manslaughter in a case in which the defendant mother allowed her live-in boyfriend to beat her child brutally and repeatedly, eventually resulting in the child's death); *State v. Zobel*, 81 S.D. 260, 134 N.W.2d 101, 108–09 (1965) (upholding conviction for second-degree manslaughter where the defendant father knew of his wife's extensive abuse of their children but did nothing to stop her), *overruled on other grounds by State v. Waff*, 373 N.W.2d 18 (S.D. 1985).

**7.** As Back notes, this case is different from other cases where we have affirmed second-degree manslaughter convictions, because Back did not personally wield a deadly weapon. *See, e.g., Frost*, 342 N.W.2d at 318–20 (holding the evidence was sufficient to sustain the second-degree manslaughter conviction of a wife who armed herself with a gun with the intent of scaring her abusive husband but accidentally killed him when the gun discharged during the course of their fight); *State v. Swanson*, 307 Minn. 412, 416–17, 240 N.W.2d 822, 825 (1976) (holding that the evidence supported a finding that defendant was guilty of second-degree manslaughter where the defendant pulled out his gun and fired at close range, intending to prevent the victim from advancing but not to kill him); *State v. Spann*, 289 Minn. 497, 499–500, 182 N.W.2d

873, 874–75 (1970) (holding that there was a factual basis for a plea to second degree manslaughter where a defendant armed himself with a knife and stabbed the unarmed victim in the course of a fight). The theory underlying these deadly weapons cases is that individuals handling dangerous weapons have a duty of care not to handle them in such a way as to harm others, and if they do, they have breached their duty of care. Because the evidence is uncontested that Back did not wield the gun that killed Holliday, these deadly weapons cases do not support the conclusion that Back had a duty of care in this case.

**8.** The State also cites *State v. Cantrell*, 220 Minn. 13, 20–21, 18 N.W.2d 681, 684–85 (1945) (finding a duty to stand guard over the premises during the fumigation process both as a matter of employment contract and city ordinance and concluding this duty was breached when defendant left the house poorly secured and went to a bar), and *State v. Schaub*, 231 Minn. 512, 513–15, 44 N.W.2d 61, 62–63 (1950) (addressing certified questions relating to causation in the context of the defendant's act of opening the gas jets of the gas stove in his apartment and unscrewing the cap on the gas line in a suicide attempt). But *Schaub* and *Cantrell* are inapposite to the culpable negligence issue presented in this case because, unlike this case, they do not involve the criminal activity of a third person.

son, 553 N.W.2d at 49–50 (discussing special relationships that give rise to a duty to control or a duty to protect). The State did not introduce any evidence to support the conclusion that Back had a relationship with Holliday suggesting she would protect Holliday or that Holliday assumed she would protect him. *See, e.g., Delgado,* 289 N.W.2d at 483–84 ("Such special relationships exist between parents and children, masters and servants, possessors of land and licensees, common carriers and their customers, or people who have custody of a person with dangerous propensities."); *Bjerke,* 742 N.W.2d at 667–68 (imposing a duty on a homeowner to protect a child invitee from sexual abuse by the other adult resident). Likewise, there was no evidence to support the conclusion that Back had an obligation to direct or control Super in any way. *See, e.g., Johnson,* 553 N.W.2d at 50 (holding that halfway house did not have duty to control parolee); *cf. Ponticas,* 331 N.W.2d at 911 (imposing a duty on an employer based on the employment relationship to use reasonable care in hiring an employee who might pose a danger to tenants). We hold that under the circumstances presented here Back did not have a duty to control Super or to protect Holliday from Super, and she therefore was not culpably negligent in failing to control Super's criminal actions.

Because the evidence is not sufficient to prove that Back was culpably negligent, Back's conviction for second-degree manslaughter is reversed.

Reversed.