**STATE of Minnesota, Respondent,**

v.

**Kevin Thomas McCORMICK, Appellant.**

**No. A12–1253.**

Court of Appeals of Minnesota.

Aug. 12, 2013.

---

Lori Swanson, Attorney General, St. Paul, MN; and Richard C. Mollin, Jr., Clearwater County Attorney, Bagley, MN, for respondent.

Robert M. Christensen, Robert M. Christensen P.L.C., Minneapolis, MN, for appellant.

Considered and decided by CONNOLLY, Presiding Judge; STONEBURNER, Judge; and RODENBERG, Judge.

## OPINION

RODENBERG, Judge.

On appeal from a grant of a new trial after a jury verdict finding appellant guilty of second-degree manslaughter, appellant argues that (1) the district court erred by not granting a motion for judgment of acquittal and (2) he is protected from retrial by the double jeopardy provisions of the United States and Minnesota Constitutions. We reverse.

## FACTS

On the evening of November 5, 2010, appellant Kevin McCormick discovered a deer stand, which he believed was located on his property.[1] The deer stand was a raised platform supported by one-inch metal tubing. The stand had a square base measuring between three feet and five feet on each side with an elevated plywood floor and a canvas tarp, which was held up by a metal rail around the seating area. Appellant became angry about the location of the deer stand. He approached a hunting party that included J.B., a retired man in his 60s, and 11 other individuals, and informed them that the deer stand was encroaching on his property. None of the members in the hunting party admitted owning the deer stand.

The next day, November 6, was the opening day of deer-hunting season. According to the other members of his hunting party, J.B. appeared cheerful and talkative early that day. At about 10:00 a.m., and after J.B. had taken a position on the deer stand described above, appellant again approached the deer stand and accused J.B. of trespassing. During their interaction, the deer stand fell. That evening, J.B. was taken by ambulance to the hospital where hospital personnel discovered that J.B. had sustained a dislocated shoulder, multiple broken ribs, and thoracic spinal fractures. On November 24, J.B. died from complications of these injuries. Whether J.B. sustained these injuries when the deer stand fell and whether the fall from the stand on the morning of November 6 was the cause of J.B.'s death were in dispute at trial.

Appellant is the only surviving eyewitness to the fall of the deer stand on the morning of November 6. There were, however, other hunters in the vicinity who were able to hear appellant's encounter with J.B. N.M. and R.R., who were members of a separate hunting party, testified that they heard a discussion between two people in the vicinity of J.B.'s deer stand. N.M. testified that he heard two voices talking, a person angrily shout "get out," followed by a crash or thud, and then the sound of an all-terrain vehicle (ATV) driving away. R.R. testified that he heard one soft voice and one loud voice. The loud voice made accusations of trespassing. He heard the loud voice scream "get out" and then heard a loud crash. After the crash, R.R. heard one of the voices apologizing, but was unable to make out which of the two voices was apologizing.

Appellant made several statements about what occurred, including a 911 call made shortly after the incident, wherein appellant reported that "as I climbed up his stand to remove his tarp his whole stand and me and him tipped over." Appellant told the 911 operator that J.B. "got up under his own power," gathered his

---

1. The parties agree that the deer stand was not actually located on appellant's property, but was located on land adjacent to appellant's property.

things, and rode away on an ATV. He also told a friend that he had held onto the deer stand's tarp in reaching up to hand J.B. a business card and that the stand had fallen over.

In a statement to the police after his arrest, appellant stated that he had a discussion with J.B. in which he accused J.B. of trespassing. Appellant stated that he had tried to extend his business card to J.B., and in doing so climbed onto the side of the deer stand. He felt the deer stand tipping and then it fell. Appellant stated that J.B. "was injured but at the time there was no injury there."

Appellant demonstrated and recorded a reenactment of the events of November 6 sometime after the incident, using his cellular telephone. In the reenactment, appellant describes trying to hand J.B. a business card. In doing so, appellant claims to have stepped on the bottom rung of the stand, which can be seen wobbling in the video. In the video, appellant steps back while putting his hands up in the air and saying that he believes J.B. then stood up, but that his view was blocked by the tarp. Appellant then steps up to the deer stand, stating "but watch this, watch this, I'm not even exerting energy here, this is one hand." He pulls on the deer stand with one hand, and the deer stand can be seen toppling.

D.Z., a member of J.B.'s hunting party, saw J.B. driving back to the campsite on an ATV shortly after 10:00 a.m. When D.Z. returned to the campsite an hour later, J.B. was sitting in a pickup truck and D.Z. helped J.B. out of the truck and helped him walk slowly to a camping chair near the camper.

The members of the hunting party noted that J.B. kept to himself and was uncharacteristically quiet during the lunch hour. L.P. observed that his face was "flushed." However, none of them observed any indication that J.B. was in pain. T.Z., another member of the party, noticed that J.B.'s rifle was plugged with mud and helped him clean it. After cleaning the rifle, T.Z. had J.B. fire a test shot to see if the scope was working properly. J.B. fired at and hit a paper plate set up on a tree branch at a distance of 40 yards. T.Z. did not observe whether J.B. was bothered by the rifle's recoil.

After lunch, T.Z. walked with J.B. to a different deer stand, clearing a path for him. J.B. was walking slowly, hanging on to tree branches, and stopping to catch his breath now and then. J.B. later returned to the camp site to retrieve a camping chair for the second deer stand.

Between 6:00 p.m. and 7:00 p.m., L.P. returned to the cabin where J.B. was staying. He found J.B. lying in bed still dressed in his hunting gear and boots. J.B. was moaning and groaning. He was breathing heavily, struggling to breathe, and looked to be in pain. L.P. called an ambulance, which arrived and took J.B. to a hospital.

J.B.'s chair and hat were found below the deer stand to which J.B. had gone with T.Z. after lunch. A heater and soft drink were found on top of that deer stand. The record does not establish who placed these items at that location.

Appellant was charged with second-degree manslaughter. Prior to trial, appellant moved to exclude any evidence of J.B.'s statements to law enforcement or medical personnel, and to redact any such statements from his medical records. The district court granted these motions.

At trial, without prompting, D.Z. testified, "And I says, what'd you come out so early for. And he said, I got pulled out of my stand." Appellant's counsel immediately objected, the jury was removed from the courtroom, and appellant moved for a

mistrial. The district court took the motion under advisement, called the jury back in, and gave a cautionary instruction.

Two expert prosecution witnesses testified that J.B.'s death on November 24 resulted from trauma sustained on November 6. Dr. Joseph Tieszen, a critical care doctor who treated J.B. during J.B.'s hospitalization, testified that J.B.'s condition deteriorated over the course of his hospitalization. After a surgery on November 16, to stabilize J.B.'s spine and repair other injuries, "his respiratory system never did work well." He had a lung collapse, renal failure, atrial fibrillation and other complications. J.B. "had an acute deterioration" on November 23, according to Dr. Tieszen's testimony, and J.B. was taken off of the ventilator which had been necessary to sustain his life after the November 16 surgery. J.B. died on the 24th. On cross-examination, Dr. Tieszen testified that J.B.'s injuries would have been painful immediately, but that different people respond differently to pain.

Dr. Michael McGee, a forensic pathologist, testified that the cause of J.B.'s death was "complications of traumatic injuries and that would be due to a fall from a deer stand." He agreed that he did not know "when the fall occurred" but that it was some time on November 6, prior to J.B.'s hospitalization.

Later, appellant called Dr. Mary Carr as a witness. Dr. Carr testified that the description of J.B.'s behavior during the lunch hour was inconsistent with the injuries which ultimately caused J.B.'s death. She opined that the injuries must have occurred between the time that J.B. had gone to the second deer stand and when he was found in bed back at the cabin. She stated that it would have been extraordinarily unusual for J.B. not to give any indication of pain at lunchtime, had he sustained these extensive injuries prior to

the noon meal. She also stated that appellant would not have been able to drive an ATV or fire a rifle with broken ribs and a dislocated shoulder.

During cross examination, the following exchange occurred:

Q. Dr. Carr, in the—all the medical records you read ... In the Naytahwaush ambulance record, did you see any indication of a second or subsequent injury reported by the patient?

A. I guess I don't understand the question.

Q. Well, there was a history taken in each case, wasn't there?

A. Oh, if he had a subsequent—

Q. If there was two falls—

A. —fall?

Q. —or some other? Did you see that in any of the records?

A. He never reported that.

Q. In fact, he just reported, fell out of a deer stand?

A. Yes, he did.

Q. Okay. And in the Mahnomen ambulance, likewise, he said, fell out of a deer stand?

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Counsel approach.

The transcript does not reveal the basis for the objection, nor any ruling thereon, but there was no further testimony from Dr. Carr regarding the history given by J.B. to the medical personnel who treated him.

The jury returned a verdict of guilty on the charge of second-degree manslaughter. Appellant moved for a judgment of acquittal based on insufficient evidence and for a new trial based on prosecutorial misconduct. The district court denied the motion for a judgment of acquittal but granted the motion for a new trial. The district court

found that the prosecutor's cross-examination of Dr. Carr violated the in limine order and was prosecutorial misconduct that was not harmless beyond a reasonable doubt.

Appellant then moved to dismiss the complaint based on the protections afforded by the double jeopardy clauses of the United States and Minnesota Constitutions. The district court denied the motion, finding that, although the prosecutor's misconduct was "intentional" and "clearly improper," the prosecutor was not "attempting to goad the defendant into moving for a mistrial." This appeal followed.

## ISSUES

I. Did the district court err in denying appellant's motion for judgment of acquittal?

II. Did the district court err in denying appellant's motion to dismiss under the double jeopardy clauses of the United States and Minnesota Constitutions?

## ANALYSIS

### I.

Appellant argues that the evidence presented at trial was insufficient for the jury to have convicted him of second-degree manslaughter under Minn.Stat.

§ 609.205(1) (2010), and that the district court erred in denying his motion for judgment of acquittal.

### A.

This appeal follows the district court's denial of appellant's motion for a judgment of acquittal and grant of his new-trial motion. Minn. R.Crim. P. 28.02, subd. 2(2)(b)(1), provides for appeal as of right from such orders in felony and gross misdemeanor cases. This appeal is not a challenge to the sufficiency of the evidence supporting the jury's verdict, because the order granting a new trial vacated the jury verdict. *See Ayer v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 189 Minn. 359, 361, 249 N.W. 581, 582 (1933) (stating that an order granting a new trial after judgment has been entered vacates the verdict and the judgment even if the motion for a new trial did not ask for them to be vacated). Rather, this appeal challenges the district court's denial of appellant's motion for judgment of acquittal, based on a sufficiency-of-the-evidence argument.

 A jury verdict enjoys a deferential standard of review. *State v. Parker*, 353 N.W.2d 122, 127 (Minn.1984). This deferential review is difficult to apply in cases wherein the evidence establishing guilt is largely circumstantial.[2] On appeal

---

**2.** When reviewing a jury's verdict in the absence of a specific instruction on the proper use of circumstantial evidence, *see* 10 *Minnesota Practice*, CRIMJIG 3.05 (2006), we observe that a general verdict of guilty does not indicate what circumstances the jury found to have been proven beyond a reasonable doubt. As a result, reviewing courts must engage in a case-by-case evaluation of the evidence to evaluate what circumstances the jury *likely* determined were proved, defer to the jury's *likely* determinations, and then independently determine whether those circumstances give rise to any inferences inconsistent with guilt. *See, e.g., State v. Al–Naseer*, 788 N.W.2d 469, 473–81 (Minn.2010); *State v. Andersen*, 784

N.W.2d 320, 329–33 (Minn.2010); *State v. Tscheu*, 758 N.W.2d 849, 857–61 (Minn. 2008); *State v. Reynua*, 807 N.W.2d 473, 482–84 (Minn.App.2011), *rev'd in part and remanded on other grounds* (Minn. Feb. 28, 2012); *State v. Orfi*, 511 N.W.2d 464, 471–72 (Minn. App.1994), *review denied* (Minn. Mar. 15, 1994); *State v. McBroom*, 394 N.W.2d 806, 810–11 (Minn.App.1986), *review denied* (Minn. Jan. 16, 1987). Where, as here, the circumstantial evidence is complex and voluminous, it is difficult if not impossible for a reviewing court to know what evidence the jury believed. The difficulties of such review could be minimized by providing the jury a "ration-

from such cases, our responsibility is to identify all reasonable inferences that can be drawn from the circumstances proved by the evidence and to determine whether those inferences support any rational hypotheses other than guilt. *See State v. Al–Naseer*, 788 N.W.2d 469, 473 (Minn.2010); *State v. Andersen*, 784 N.W.2d 320, 329–30 (Minn.2010); *State v. Tscheu*, 758 N.W.2d 849, 857 (Minn.2008). In doing so, we defer to the jury's determination as to what circumstances were proved. *Al–Naseer*, 788 N.W.2d at 473. We do not defer to the jury's evaluation of the inferences drawn from the circumstances proved. *Id.*

A motion for acquittal is "procedurally equivalent to a motion for a directed verdict." *State v. Slaughter*, 691 N.W.2d 70, 74 (Minn.2005). A motion for a directed verdict presents the district court with a question of law. *M.W. Ettinger Transfer & Leasing Co. v. Schaper Mfg., Inc.*, 494 N.W.2d 29, 34 (Minn.1992). Our review of questions of law is not deferential. We review questions of law de novo. *Harrison v. Comm'r of Pub. Safety*, 781 N.W.2d 918, 920 (Minn.App.2010). In a criminal case, the test to be applied is "whether, after viewing the evidence and all resulting inferences in the light most favorable to the state, the evidence is sufficient to present a fact question for the jury." *State v. Hormann*, 805 N.W.2d 883, 892 (Minn.App.2011), *review denied* (Minn. Jan. 17, 2012). Appellant's appeal of the denial of his posttrial motion for judgment of acquittal therefore requires us to conduct a de novo review of the sufficiency of the state's circumstantial evidence.

**B.**

At trial, each element of a criminal charge must be proven beyond a reasonable doubt. *State v. Auchampach*, 540 N.W.2d 808, 816 (Minn.1995). Where any material element is to be proven by circumstantial evidence, proof beyond a reasonable doubt requires that "the facts proven by circumstantial evidence must be consistent with each other ... and must exclude every other reasonable conclusion except that of the guilt of the defendant." *State v. Kolander*, 236 Minn. 209, 216–17, 52 N.W.2d 458, 462–62 (1952), *quoted in Al–Naseer*, 788 N.W.2d at 475.

Our review of the sufficiency of circumstantial evidence proceeds in two stages. *Al–Naseer*, 788 N.W.2d at 473–74. First, we determine the proven circumstances. *Id.* This step in the analysis requires us to apply the governing standard of review. *See id.* (applying a deferential standard of review in a post-verdict matter). In this case, the applicable standard of review requires that we evaluate de novo what factual circumstances have sufficient evidentiary support to present to the jury as questions of fact when the evidence is viewed in the light most favorable to the state. *Hormann*, 805 N.W.2d at 892.

The second stage of review requires us to independently evaluate the reasonableness of all inferences to be drawn from the circumstances proved, including those inconsistent with guilt. *Al–Naseer*, 788 N.W.2d at 473–74. If any of these inferences are inconsistent with guilt, then there is reasonable doubt as to guilt. *Id.*[3]

al-hypothesis instruction direct[ing] the jury's attention to the appropriate method for evaluating [circumstantial] evidence." *Andersen*, 784 N.W.2d at 340 (Meyer, J., concurring).

**3.** We apply this two-step analysis to those elements as to which the state's proof necessarily depends on circumstantial evidence. *State v. Porte*, 832 N.W.2d 303, 309 (Minn. App.2013). *State v. Silvernail*, 831 N.W.2d 594, 604 (Minn.2013) (Stras, J., concurring).

## 1.

■ Appellant argues that the circumstantial evidence presented is insufficient to establish that he had the requisite state of mind to be guilty of second-degree manslaughter. Minnesota law provides that a person who causes the death of another "by the person's culpable negligence whereby the person creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another" is guilty of second-degree manslaughter. Minn.Stat. § 609.205(1) (2010). This standard is satisfied by establishing (1) objective gross negligence on the part of the actor and (2) subjective "recklessness in the form of an actual conscious disregard of the risk created by the conduct." *State v. Frost*, 342 N.W.2d 317, 320 (Minn.1983). The objective aspect is satisfied by demonstrating that the act was "a gross deviation from the standard of care that a reasonable person would observe in the actor's situation." *Id.* at 319 (quotation omitted); *State v. Back*, 775 N.W.2d 866, 869 n. 5 (Minn.2009).

The subjective aspect requires a finding of the actor's state of mind. The Minnesota Supreme Court has stated that "[a] state of mind is generally proven circumstantially, by inference from words or acts of the actor both before and after the incident. A [fact-finder] is permitted to infer that a person intends the natural and probable consequences of their actions." *State v. Johnson*, 616 N.W.2d 720, 726 (Minn.2000) (citations omitted).

■ Here, there was direct evidence on the issue of objective gross negligence. Appellant's statements and the reenactment video were direct evidence of what appellant did. During trial, the jury observed the deer stand, which was set up and located in a separate room. And appellant demonstrated in the reenactment video how the deer stand behaved when handled. This evidence, when viewed in the light most favorable to the state, would permit the jury to evaluate whether climbing the deer stand would constitute a gross deviation from an objective standard of care.

■ However, whether appellant consciously disregarded the risk that the deer stand would topple over was necessarily proven by circumstantial evidence. The record contains, on the question of how the deer stand fell in the morning, only appellant's accounts (in which appellant disclaimed any prior awareness of the deer stand's unsteadiness) and the testimony of two witnesses who heard an argument just before hearing a crash, but who did not see what happened. The circumstantial evidence admits of rational inferences other than that appellant intentionally or in conscious disregard of the risk toppled the deer stand. For example, appellant claims he was handing J.B. a business card when the stand toppled by reason of its instability. One of appellant's business cards was found at J.B.'s cabin after the incident. The record supports the rational inference that appellant neither was nor should have been aware that the deer stand was unstable. Handing a business card to a person in a deer stand which then accidentally topples does not reflect conscious disregard of a risk created by the actor. Even taking the evidence in the light most favorable to the state, and although the evidence reasonably supports inferences consistent with appellant's guilt, we are compelled to conclude that there are also reasonable inferences to be drawn from the circumstances proved that are inconsistent with a reckless state of mind.

## 2.

■ A person is guilty of second-degree manslaughter when the person

"cause[s] the death of another." Minn. Stat. § 609.205. This requires not only that the act be the cause of the death, but also that it be the proximate cause of the injury. *State v. Schaub*, 231 Minn. 512, 518, 44 N.W.2d 61, 64 (1950); *Back*, 775 N.W.2d at 869 n. 5. In resolving this question, the fact-finder considers whether "the act of the defendant [was] the proximate cause of the death of [the victim] without the intervention of an efficient independent force in which defendant did not participate or which he could not reasonably have foreseen." *Schaub*, 231 Minn. at 518, 44 N.W.2d at 64.

Here, the determination that J.B.'s injuries were caused by the fall from the deer stand involving appellant is based on circumstantial evidence. J.B.'s own statements on the issue were deemed inadmissible. All that remains in the record before us on the subject of J.B.'s condition between the morning fall and his hospitalization later in the day are the observations of appellant and J.B.'s hunting partners. The circumstantial evidence supports several rational hypotheses. While J.B.'s silence during the midday would be logically consistent with his having sustained extensive injuries from the encounter with appellant, it is also consistent with the inference that J.B.'s mood had been affected by the confrontation with appellant. There is also circumstantial evidence from this time period directly contradicting the inference that the morning fall from the deer stand caused the injuries that ultimately led to J.B.'s death. For example, Dr. Carr testified that J.B. would not have been physically capable of firing a rifle with a dislocated shoulder. Yet T.Z., a witness for the state, observed J.B. shoot a paper plate from 40 yards away after the morning incident. Evidence that J.B. rode an ATV away from the morning encounter with appellant, did not appear to be in

significant pain during lunch, and then went to the second deer stand (where some of his items were found atop that stand) is also inconsistent with the inference that J.B. sustained extensive injuries during his encounter with appellant.

■■■■ The burden is not on appellant to prove an alternate explanation for the cause of J.B.'s injuries. Rather, the burden is on the state to prove beyond a reasonable doubt that appellant's tipping of the deer stand was the proximate cause of the injuries leading to J.B.'s death. *Cf. Auchampach*, 540 N.W.2d at 816 (requiring the state to prove each element of the offense beyond a reasonable doubt). Even viewing the facts in the light most favorable to the state, the record evidence supports inferences that are inconsistent with all of J.B.'s injuries having occurred in the morning when appellant toppled the deer stand. J.B. may have fallen from a second deer stand. He may have fallen while trying to climb the second stand, perhaps as a result of some injuries sustained in the morning. A heater and a can of soda were atop the second deer stand, and J.B.'s hat and a chair were on the ground near it. J.B. is known to have been riding an ATV after the morning fall. Something else may have happened in the time between lunch with his companions and his arrival at the cabin, to which he apparently drove. There is no evidence that accounts for where J.B. was or what he was doing during that period of time. Accordingly, we hold that the state has not met its burden of demonstrating that there are no reasonable inferences from the record evidence that are inconsistent with appellant's guilt.

We are obligated under current authority to analyze the circumstantial evidence as we have done here. *See, e.g., Al–Naseer*, 788 N.W.2d at 473–74. The applica-

ble standard of review compels us to conclude that the district court erred in its application of the existing law regarding the evaluation of circumstantial evidence and should have granted appellant's motion for judgment of acquittal. *See id.; Hormann,* 805 N.W.2d at 892.

## II.

■■■■ Although we have determined that insufficient evidence was presented at trial to sustain appellant's conviction, we believe that the interests of judicial economy warrant addressing appellant's double-jeopardy claims. The application of double jeopardy is a question of law, which we review de novo. *In re Welfare of J.L.P.,* 709 N.W.2d 289, 291 (Minn.App.2006). However, findings of fact made by the district court in deciding constitutional questions are reviewed for clear error. *State v. Dickey,* 827 N.W.2d 792, 796 (Minn.App.2013). A finding of fact is clearly erroneous when it "is either manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Welfare of Children of T.R.,* 750 N.W.2d 656, 660–61 (Minn.2008) (quotation omitted). This standard is satisfied when the reviewing court is left with "the definite and firm conviction that a mistake was made," *Vangsness v. Vangsness,* 607 N.W.2d 468, 474 (Minn.App.2000), "despite viewing [the] evidence in the light most favorable to the [district] court's findings." *Id.* at 474.

## A.

The United States Constitution prohibits twice putting a criminal defendant in jeopardy of punishment for the same offense.

U.S. Const. amend. V. This provision has been incorporated through the Due Process Clause of the Fourteenth Amendment and is applicable against the states. U.S. Const. amend XIV; *Benton v. Maryland,* 395 U.S. 784, 793, 89 S.Ct. 2056, 2062, 23 L.Ed.2d 707 (1969).

■■■■ The Double Jeopardy Clause of the Fifth Amendment guarantees that when a trial ends in a mistrial, declared over the objection of the defendant, a second trial is barred absent a "manifest necessity" for the mistrial. *Oregon v. Kennedy,* 456 U.S. 667, 672, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982). However, when "the defendant himself has elected to terminate the proceedings against him, the 'manifest necessity' standard has no place in the application of the Double Jeopardy Clause."[4] *Id.* Instead, when the defendant has requested that the district court declare a mistrial due to prosecutorial misconduct, retrial is not barred except when the misconduct was "intended to 'goad' the defendant into moving for a mistrial." *Id.* at 676, 102 S.Ct. at 2089. The presence or absence of such intent is a question of fact. *Id.* at 675, 102 S.Ct. at 2089.

■■■■ Here, the district court found that the prosecutor did not commit misconduct with the intention of provoking a mistrial. This finding of fact is not clearly erroneous because the district court reasonably inferred that the prosecutor intended to circumvent the in limine ruling in order to negate evidence presented by appellant at trial. Thus, the district court did not err by determining that appellant's retrial does not violate the Double Jeopardy Clause of the United States Constitution.

---

4. The state argues at length that the "manifest necessity" standard governs this case. Because this appeal involves a mistrial granted on a defendant's motion, the state's reliance on the "manifest necessity" standard is misplaced. *See Kennedy,* 456 U.S. at 672, 102 S.Ct. at 2087.

## B.

The Minnesota Constitution contains a provision that parallels the federal Double Jeopardy Clause. Minn. Const. art. I, § 7. While Minnesota is "free to interpret the Minnesota Constitution as affording greater protection ... than the United States Constitution," our courts " 'will [not] cavalierly construe our constitution more expansively than the United States Supreme Court has construed the federal constitution.' " *State v. Askerooth*, 681 N.W.2d 353, 361–62 (Minn.2004) (quoting *State v. Fuller*, 374 N.W.2d 722, 726–27 (Minn.1985)). Because the Double Jeopardy Clause of the Fifth Amendment is "textually identical" to Minnesota's Double Jeopardy Clause, decisions of the United States Supreme Court interpreting the federal constitutional provision are "of inherently persuasive, although not necessarily compelling force." *Fuller*, 374 N.W.2d at 726–27. When the United States Supreme Court has not made "a sharp or radical departure from its previous decisions or approach to the law," our supreme court will generally apply the United States Supreme Court's interpretation of federal constitutional provisions to parallel state constitutional provisions. *Kahn v. Griffin*, 701 N.W.2d 815, 828 (Minn.2005).

We are "an error-correcting court and it is not the role of this court to abolish established judicial precedent." *State v. Adkins*, 706 N.W.2d 59, 63 (Minn. App.2005). Our role is "to find the law, to state it and to apply it to the facts." *In re Trusteeship of Trust of Williams*, 631 N.W.2d 398, 410 (Minn.App.2001), *review denied* (Minn. Sept. 25, 2001). "Only when there are no statutory or judicial precedents to follow will the Court of Appeals make new law." *Id.*

In *Fuller*, the supreme court declined to adopt a more stringent standard for Minnesota's double jeopardy clause than the United States Supreme Court announced in *Kennedy*. 373 N.W.2d at 727. *Fuller* established precedent holding the protection offered by the Minnesota Double Jeopardy clause to the same level as that announced in *Kennedy*. To the extent that *Kennedy* was a sharp departure from prior decisions at the time that it was decided, this concern has long since faded as *Kennedy* and *Fuller* have been the governing standard for a generation. There is therefore applicable, controlling judicial precedent, and this court's role is to recognize and apply the controlling precedent. *Adkins*, 706 N.W.2d at 63; *Trust of Williams*, 631 N.W.2d at 410.

The district court did not err in holding that double jeopardy does not prevent retrial.

## DECISION

In sum, the district court correctly ruled that, under present Minnesota law, appellant's double jeopardy rights would not be violated by subjecting him to another trial because the prosecutorial misconduct that prompted the mistrial was not intended to goad appellant into moving for a mistrial. But because the circumstantial evidence presented at trial on the issues of recklessness and proximate cause supports reasonable inferences inconsistent with appellant's guilt, we conclude that the district court erred in denying appellant's motion for a judgment of acquittal.

**Reversed.**

CONNOLLY, Judge (concurring in part, dissenting in part).

I concur with part II of the decision, but I respectfully dissent from part I. I would affirm the district court's decision to deny appellant's motion for judgment of acquittal. I believe that, under the appropriate

standard of review, the evidence was sufficient to support the jury's verdict.

"A motion for judgment of acquittal is properly denied where the evidence, viewed in the light most favorable to the State, is sufficient to sustain a conviction." *State v. Simion,* 745 N.W.2d 830, 841 (Minn.2008); *see also* Minn. R.Crim. P. 26.03, subd. 18(1), (3) (providing that a defendant may move for judgment of acquittal at the close of evidence of either party "if the evidence is insufficient to sustain a conviction" or within 15 days after the jury is discharged if the jury returns a verdict of guilty). As the supreme court's statement in *Simion* demonstrates, a post-verdict motion for judgment of acquittal is a motion challenging the sufficiency of the evidence to sustain the conviction. "In assessing the sufficiency of the evidence, we review the evidence to determine whether the facts in the record and the legitimate inferences drawn from them would permit the jury to reasonably conclude that the defendant was guilty beyond a reasonable doubt of the offense of which he was convicted." *State v. Al–Naseer,* 788 N.W.2d 469, 473 (Minn.2010) (quotation omitted). "The jury's verdict will be upheld if, giving due regard to the presumption of innocence and to the state's burden of proof beyond a reasonable doubt, the jury could reasonably have found the defendant guilty." *Id.* (quotation omitted). I believe this articulation of the appropriate standard of review is properly more deferential to the jury's verdict.

I disagree that the circumstances proved are consistent with a rational hypothesis of innocence, specifically that appellant did not act with culpable negligence and that his actions were not the proximate cause of J.B.'s death. I believe that when viewing the verdict with the proper deference, the only rational hypotheses supported by the reasonable inferences drawn from the circumstances proved are that appellant acted with culpable negligence and that his actions were the proximate cause of J.B.'s death.

To establish second-degree manslaughter, the state was required to prove beyond a reasonable doubt that appellant acted with (1) objective gross negligence; and (2) subjective "recklessness in the form of an actual conscious disregard of the risk created by the conduct." *State v. Frost,* 342 N.W.2d 317, 320 (Minn.1983). Here, there was direct evidence of appellant's objective gross negligence. And I disagree that there are "rational inferences other than that appellant intentionally or in conscious disregard of the risk toppled the deer stand."

First, the state did not need to prove that appellant intentionally toppled the deer stand. Rather, the state was required to prove beyond a reasonable doubt that appellant acted with subjective recklessness. This element required that the jury have sufficient evidence to make a finding as to appellant's state of mind. As the supreme court has noted, "[a] state of mind generally is proved circumstantially, by inference from words and acts of the actor both before and after the incident. A [fact-finder] is permitted to infer that a person intends the natural and probable consequences of their actions." *State v. Johnson,* 616 N.W.2d 720, 726 (Minn.2000) (citation omitted). Because the state relied on circumstantial evidence to prove appellant acted with subjective recklessness, "the circumstances proved must be consistent with the hypothesis that the accused is guilty and inconsistent with any other rational hypothesis except that of guilt." *Al–Naseer,* 788 N.W.2d at 473 (quotation omitted).

The circumstances proved in this case are as follows. On the evening of November 5, appellant approached J.B.'s hunting

party and angrily informed them that a deer stand was trespassing on his property. The deer stand was a scaffold between approximately 10 feet high constructed from one-inch metal tubing, with a plywood floorboard. The seating area at the top of the stand was surrounded by a metal rail wrapped in a canvas tarp. On the morning of November 6, members of a different hunting party overheard an argument coming from the vicinity of J.B.'s deer stand. They heard an angry voice make accusations of trespassing and then shout "get out." They then heard a loud crash and one of them heard someone apologizing. In a 911 call, appellant reported that "as I climbed up his stand to remove his tarp his whole stand and me and him tipped over."[5] In a video reenactment, appellant pulls over the deer stand with one hand.

In my view, the circumstances proved are inconsistent with a rational hypothesis other than guilt. Appellant's actions before the incident indicate that he was very angry about the deer stand trespassing on his land. Other hunters in the area overheard him angrily confront J.B. and shout "get out." He admitted on the 911 call that he climbed on the stand to remove the tarp that wrapped around the railing. It was clear that the deer stand was unsteady when appellant simply placed a hand or foot on the stand. We infer that a person intends the natural and probable consequences of his actions. *Johnson,* 616 N.W.2d at 726. The circumstances proved demonstrate that, in climbing the deer stand to remove the tarp, appellant acted with a conscious disregard of the risk cre-

ated by his conduct. There are no *reasonable* inferences from appellant's actions on that morning that are inconsistent with subjective recklessness.

I also disagree that there are rational inferences other than that appellant's actions were not the proximate cause of J.B.'s death. The circumstances proved regarding proximate cause were as follows. Appellant angrily confronted J.B. at the deer stand, and other hunters heard a loud crash or thud. J.B. fell from the tree stand and remained on the ground for approximately five minutes after his fall. Appellant called 911 to report that the tree stand had tipped over and that J.B. had fallen from the stand. Back at the campsite, a member of J.B.'s party observed J.B. get out of his truck, walk very slowly, and sit down in a chair that had been set up for him. J.B. was uncharacteristically quiet at lunch, and his face was flushed.[6] After lunch, another member of the party walked with J.B. to a different hunting stand. J.B. walked slowly, hung onto tree branches, and stopped frequently to catch his breath. A member of J.B.'s hunting party found him hours later that day back at the cabin in severe pain and distress.

Appellant argues that the circumstances proved support an inference that J.B. fell from, or was injured at, a second tree stand in the afternoon. But this is pure speculation. "We will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture." *Al–Naseer,* 788 N.W.2d at 473 (quotation omitted). While a soda can and heater were found in the second tree stand and J.B.'s hat and

---

**5.** Although appellant later changed his story and argued that he had simply been handing appellant his business card, in accordance with our standard of review, we must view the facts in the light most favorable to the state. *See Simion,* 745 N.W.2d at 841.

**6.** I am not persuaded that J.B.'s ability to fire a gun over the lunch hour disproves that he was injured from his fall from the deer stand. The jury heard this evidence and was similarly unpersuaded. The human body's ability to mask pain with adrenaline has been well documented.

chair were found below the tree stand, there is absolutely no evidence whatsoever of a second fall. There is no evidence, for example, of an impression in the ground from a second fall, or that the chair and hat were lying haphazardly, as if they had fallen from the tree stand. This is not like *Al–Naseer*, where the supreme court held that the circumstances proved were consistent with a rational hypothesis other than that Al–Naseer had known that he had hit a person or a vehicle because there was some evidence to indicate that Al–Naseer had been asleep at the wheel. *Id.* at 477. Rather, this case is comparable to *State v. Tscheu*, 758 N.W.2d 849, 861 (Minn.2008), in which the supreme court stated that, "Tscheu's hypothesis that he engaged in consensual vaginal sex with Thoms and that Thoms was subsequently attacked and murdered by a different person is not reasonable." Similarly, here, appellant's hypothesis that J.B. fell out of one tree stand in the morning due to appellant's actions, and subsequently fell out of a second tree stand in the afternoon, is not reasonable. In fact, it is simply incredible.

Because the record contains competent evidence reasonably tending to sustain the verdict, and because the circumstances proved are inconsistent with a rational hypothesis of innocence, I would affirm the district court's denial of appellant's motion for judgment of acquittal.